John HURN, III, Appellant,

v.

STATE of Alaska, Appellee.

No. A–3601.

Court of Appeals of Alaska.

April 8, 1994.

Ben Esch, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

### OPINION

Before COATS and MANNHEIMER, JJ., and WOLVERTON, District Court Judge.*

MANNHEIMER, Judge.

John Hurn, III, appeals his convictions and the sentences he received for second-degree murder, AS 11.41.110(a), and first-degree assault, AS 11.41.200(a). He also appeals the superior court's denial of his petition for post-conviction relief. We affirm.

Randy Joe Sipes, Thomas Krutsch, and the Steger brothers, Kevin and Scott, arrived at Millie's Moose River Inn in Sterling, Alaska, around 8:00 p.m. on January 26, 1989. During the evening, the men drank beer and played pool. Hurn, who lived across the street from Millie's, arrived at some point in the evening and played pool with the group. Hurn asked Kevin Steger if he would plow Hurn's driveway, and Kevin agreed. Hurn and Kevin Steger left the bar together and returned sometime later.

Hurn left the bar later in the evening, but he returned after a short time, reporting that he had run out of gas. Following his return, Hurn and Kevin Steger got into an argument, apparently because Hurn offered Kevin psychedelic mushrooms if Kevin would tow Hurn's car. Kevin, who was evidently against the use of drugs, was angered by

---

* Sitting by assignment of the chief justice made pursuant to Article IV, Section 16 of the Alaska Constitution.

Hurn's offer and loudly informed Hurn that he did not take drugs.

Shortly after this exchange of words, Hurn left the bar. Kevin, still angry at Hurn, followed him out. The other three men (Sipes, Krutsch, and Scott Steger) followed close behind. Within five minutes, a shooting occurred in the parking lot that left Kevin Steger dead and Scott Steger seriously wounded.

Although the testimony is somewhat conflicting, it appears that Hurn and Kevin continued their argument while the remaining three men tried to find their car keys. Sipes testified that he saw Hurn turn away from Kevin Steger, but that Kevin grabbed Hurn by the shoulder and spun him around. The two men started to fall to the ground. As they fell, Hurn produced a handgun and started shooting. Upon hearing the gunfire, Scott Steger ran toward Hurn and his brother, then jumped on Hurn in an effort to subdue him.

Kevin Steger was shot twice in the upper chest. Scott Steger was shot three times, twice in the abdomen and once in the right leg. Another bullet also tore through Sipes's coat, but Sipes later concluded that this had been a stray shot rather than a deliberate attack.

Sipes and Krutsch ran into the bar and told the bartender, Arthur Hirth, to call the police and an ambulance. Hurn followed them into the bar, handed his gun to Hirth, and told him, "Call the police. I shot two people." Hurn then turned to Mildred Hirth, the owner of the bar, and said, "I'm sorry Millie, I'm sorry Millie. I didn't mean to do it; I didn't mean to do it. They made me do it." Hurn also said that he needed to contact his father, because he would need to hire a lawyer.

Mildred Hirth called the police, and Hurn was later arrested. The state troopers recovered nine spent shell casings from the parking lot.

*Hurn's Attacks on His Indictment*

Hurn's first point on appeal concerns the validity of his indictment. Hurn asked the superior court to dismiss the indictment because the prosecutor failed to present evidence of statements Hurn made to Mildred Hirth and to two police officers, Officer Don Fritz and Trooper Diana Roop, concerning the reason for the shooting. Mildred Hirth stated that Hurn entered the bar after the shooting and told Hirth that he had shot someone, that he had not wanted to do it, and that the other men had ganged up on him. Trooper Roop apparently would have testified that Hurn told her that he had not meant to hurt anybody and that the last thing he remembered was the other men coming after him. Officer Fritz apparently would have testified that Hurn told him that he had been trying to go home when four men jumped him.[1]

 A prosecutor has a duty to present exculpatory evidence to the grand jury under Alaska Criminal Rule 6(q). *Frink v. State,* 597 P.2d 154, 164 (Alaska 1979). However, "the prosecutor's obligation to present exculpatory evidence to the grand jury does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant." *Id.* at 166. Moreover, Rule 6(q) does not require the prosecutor to present any and all potentially exculpatory evidence. Rather, the prosecutor is required only to present evidence "substantially favorable" to the defendant. *Lipscomb v. State,* 700 P.2d 1298, 1302 (Alaska App.1985).

 At least with respect to Hurn's statements to the two officers, it does not appear that this evidence was "substantially favorable" to Hurn's defense. The record contains neither transcriptions nor summaries of Hurn's full conversations with the two officers. However, it is clear that the particular statements Hurn claims should have been presented to the grand jury were but portions of Hurn's conversations with the offi-

---

1. Hurn's offer of proof with respect to the officers' expected statements took the form of an affidavit from his attorney. Neither Officer Fritz nor Trooper Roop gave testimony or submitted an affidavit.

cers. Rather than seeking admission of these statements at trial, Hurn unsuccessfully asked the trial judge to suppress his conversations with the two officers. This strongly suggests that Hurn's grand jury motion relied on lifting portions of his conversations with the officers out of context, and that the conversations, viewed as a whole, were not "substantially favorable" to Hurn. We note that Hurn's statements to the officers were not excited or spontaneous exclamations; rather, Hurn made these statements when the officers arrived in response to a telephone summons to investigate the shooting, after Hurn had already announced that he thought he needed an attorney.

■ Moreover, a prosecutor's duty to present exculpatory evidence is satisfied if the omitted evidence would be cumulative. For example, in *Doisher v. State*, 632 P.2d 242, 251 (Alaska App.1981), *rev'd on other grounds*, 658 P.2d 119 (Alaska 1983), this court found no prejudice when the prosecutor omitted several of the defendant's denials because one of the defendant's statements of denial was presented to the grand jury. Similarly, in *Dyer v. State*, 666 P.2d 438, 445 (Alaska App.1983), this court found that the prosecutor's failure to present evidence that a witness had lied was not cause for invalidating an indictment when the grand jury was already aware that the witness was an admitted perjurer.

In the present case, Hurn's protestations that he acted in self-defense were likewise cumulative. During the presentation of Hurn's case to the grand jury, the prosecutor played a tape of Hurn's conversation with the 911 operator. During the exchange between Hurn and the 911 operator, Hurn said, "The men were attacking me. I shot them in the body: that was the closest thing to shoot." Hurn went on to tell the operator, "My state of mind ... right now [is that] I'm worried about my life ... I want you guys out here now."

For these reasons, the superior court did not abuse its discretion when the court de-

nied Hurn's motion to dismiss the indictment for failure to present exculpatory evidence.

■ Hurn raises one more attack on the indictment. He argues that the prosecutor violated Criminal Rule 6(k) by improperly interrupting the grand jury's deliberations and redirecting their discussion of the case. Hurn's claim is based on the fact that, after the grand jury began deliberating, the prosecutor interrupted their deliberations to inform the jurors that their voices could be heard outside the room:[2]

> Mr. Foreman, ... I thought I would let you know that the construction of this room is such that if people [inside the room] are very loud, people standing out in the lobby of the courthouse can hear [them].... [I just wanted] to let you know that.... [P]eople are [not] trying to listen, but it's hard not to hear you sometimes, [even] when [we are] out in the lobby area, even some distance away. So I just wanted to [inform] you of that.

The prosecutor then took the opportunity to remind the grand jury of their task under Criminal Rule 6(q):

> The other thing I thought, I hadn't said it at the end of the case, and I thought it might be helpful to remind you again, ... sometimes my experience with past grand jurors [is that they] sometimes tend to forget ... [this] part of [their] function. And that is one of the things that the court told you at the beginning ... but it sometimes helps to be reminded now and then, is simply that you don't determine the ultimate guilt or innocence of anybody. That is, the grand jury's function is to decide [whether] somebody [should] be required to stand trial, and if so, on what charges. So the question is, ... would the evidence be enough to require that they stand trial, could a trial jury convict them, find them guilty beyond a reasonable doubt, if the evidence is unexplained or uncontradicted.

The grand jury foreman replied that the jury had been taking the nature of their

**2.** This statement and the ensuing conversation between the prosecutor and the grand jury fore- man all occurred on record.

function into account. The foreman then volunteered that the grand jurors were presently discussing "intent". The prosecutor responded that he did not want "to get involved with [their] deliberations".

The grand jury foreman then changed the subject: "We want—while you're here ... I would like to have something clarified, and that is the legal use of ... deadly force. Explain that again." A discussion on the use of deadly force and the definition of serious bodily injury ensued. The jurors asked for copies of relevant statutes and the prosecutor left to procure copies. By the time the prosecutor returned with photocopies of the requested statutes, the grand jury had already reached their decision. According to Hurn, the grand jury reached their decision nine minutes after the prosecutor finished his discussion with the grand jury.

■ Alaska Criminal Rule 6(k) provides, in pertinent part, "No persons other than the jurors shall be present while the grand jury is deliberating or voting." Rule 6(k) is modeled on Federal Criminal Rule 6(d), which has been given a very strict application by the federal courts. *Soper v. State*, 731 P.2d 587, 591 (Alaska App.1987). However, Alaska has not adopted the strict federal rule. In Alaska, an indictment will not be dismissed for a violation of Rule 6(k) unless the defendant shows that the violation prejudiced the fairness of the grand jury proceedings. *Soper*, 731 P.2d at 591–92; *Boggess v. State*, 783 P.2d 1173, 1176 (Alaska App.1989). Generally, to establish prejudice, the defendant must show that the policies behind the rule of grand jury secrecy have been undermined, or that the grand jury or a witness appearing before them has been unduly influenced by the irregularity. *Soper*, 731 P.2d at 591–92.

In Hurn's case, the prosecutor's interruption of the grand jury's deliberations appears motivated by a desire, not to compromise the secrecy of the proceedings, but rather to insure that secrecy. The prosecutor informed the grand jurors that, if they raised their voices, their deliberations could be overheard by people in the lobby outside the grand jury room.

When, following this announcement, the grand jury foreman began (unsolicited) to describe the grand jury's deliberations, the prosecutor promptly informed the foreman that he did not wish to know the content of the grand jury's discussions. When, again unprompted, the grand jury foreman then requested clarification of the law of self-defense, a proper discussion on this topic ensued. The transcript of this discussion does not support Hurn's assertion that the prosecutor exerted undue influence over the grand jury.

Having examined the record, we conclude that the superior court did not abuse its discretion when it denied Hurn's motion to dismiss the indictment for this alleged violation of Rule 6(k).

*Hurn's Application for Post–Conviction Relief*

■ Following his convictions for murder and assault, Hurn filed a petition for post-conviction relief. Hurn claimed that he had been denied his right to testify on his own behalf because his trial attorney had directed him not to take the stand, without telling Hurn that this decision was ultimately one that Hurn must make personally. *See La-Vigne v. State*, 812 P.2d 217, 222 (Alaska 1991); *see also* Rule 1.2(a) of the Alaska Rules of Professional Conduct.

The record of Hurn's trial indicates that the decision whether Hurn should take the stand was made at the very end of the defense case, just before the defense rested. On the afternoon of Monday, February 26, 1990, the defense presented the testimony of an expert witness who was apparently the last witness on the defense list. Following the completion of this expert's testimony, the trial judge indicated that it was time for the defense to disclose whether Hurn himself would testify. Hurn's attorney told the court that the defense still wished to present one other witness, Hurn's mother. Hurn's attorney outlined the testimony that the defense expected to elicit from Hurn's mother, and then he indicated that the defense might rest after her testimony. Specifically, Hurn's trial attorney stated:

> We will be resting after [Hurn's mother testifies], I believe. I will need to talk to

my client briefly, but I would anticipate that we will rest after that.... If Your Honor wishes, ... we can come back [after the court takes care of some scheduled arraignments and] tell the court as soon as we come back whether or not [Hurn] will testify.

The trial court took a 40–minute recess after Hurn's mother testified. When court reconvened, Hurn's attorney told the trial judge (in the absence of the jury) that, "[d]ue to the weakness of the State's case, Mr. Hurn will not be testifying". Later, after the jury had returned to the courtroom, the defense attorney formally announced that Hurn had elected not to testify and that the defense was resting. Hurn made no objection to any of his attorney's statements.

Several months later, after he had filed his application for post-conviction relief and had obtained a new attorney, Hurn was deposed. He testified that he and his trial attorney had several discussions about defense strategy and, particularly, the question of whether Hurn would take the stand at trial. Hurn stated that his trial attorney initially told him that he would be testifying; however, about half-way through the trial, Hurn's attorney advised him not to take the stand. Hurn testified that he challenged his attorney's advice:

Question: [W]hen do you think [you had] your first discussion with [your trial attorney] ... about whether or not you would personally get on the witness stand?

HURN: Towards the beginning of the trial, ... the first couple days.

Question: ... [W]hat do you remember of [that] conversation[?]

HURN: [The subject] was just mentioned. I don't believe that there was any conversation on the subject.

Question: Well, when you say "it was just mentioned", by whom? Who mentioned it?

HURN: I believe [my attorney] did.

Question: And what do you recall him mentioning?

HURN: That I would probably be testifying.

Question: Now, when is it ... that [your attorney] indicated to you that you probably wouldn't be testifying?

HURN: About half-way through the trial.

Question: Do you recall whether the State's case was done or not[?]

HURN: I believe it was.

Question: ... Did [your attorney] explain or say anything to you about why he might not put you on as a witness?

HURN: He said he didn't feel it was necessary.

Question: And what did you say when he told you he didn't feel it was necessary?

HURN: I told him I didn't see how we were going to prove self-defense without my testimony.

Question: Did he say anything to that?

HURN: He said that he had already proved reasonable doubt.

Question: What did you say when [your attorney] advised you that you shouldn't testify?

HURN: I told him [that], the way I understood it, ... it was imperative for a self-defense defendant to testify in order to prove the subjective [component] of [a] self-defense [claim].

Question: And ... where did you get that idea?

HURN: From talking to [the defense investigator] and from talking to—I was aware of the subjective and the objective [prongs of self-defense] from talking to [my trial attorney] himself. And I didn't see how you [were] going to prove the subjective without [my] subjective testimony.

However, Hurn conceded that the issue remained undecided until Monday, February 26, the last day of the defense case. Moreover, Hurn conceded that he had never directly confronted his trial attorney over the decision to withhold Hurn's testimony:

Question: At the start of that Monday, the day Mr. Haag testified, ... did you at that point think you were going to be a witness or not?

HURN: I didn't know. [My attorney] didn't appear to know what he was going to do until he did it.

Question: So, on that Monday, you thought there was still a possibility that you would be a witness?

HURN: Yes.

. . . . .

Question: Okay. After Mr. Haag testified, ... did you have any discussion with [your attorney] about whether you should be a witness ... ?

HURN: [Yes.] At the same recess [when] he told my mom she was going to testify, he told me that I probably would not.

Question: Okay, and what did you say to him?

HURN: I told him I thought it was important, that even though the thought of testifying was scary, that I felt that it was necessary for my case that I testified, that I still had—there [were] still questions unanswered.

Question: And what did he say to that?

HURN: That he had proved reasonable doubt.

Question: ... Now, do you recall that there was a recess before [your attorney] came back into court and told the court that ... you would not testify? Do you recall there being a recess?

HURN: Yes.

Question: During that recess, ... did you discuss ... the question of whether you would be a witness?

HURN: Yes. That's when he told me for sure that I would not be testifying.

Question: And what did you say when he told you for sure you would not be testifying?

HURN: I told him I still thought it was important.

Question: And what did he say?

HURN: He said that he had proved reasonable doubt.

Question: What did you say [then?]

HURN: I didn't argue it any farther. We had already covered this ground.

Question: Did you feel at that point [that] he was advising [you] that it was in your best interests not to testify?

HURN: I felt that he had just told me not to testify, that I wasn't going to testify. I don't recall it being in the form of advice.

Question: Did you think at that time that he was your attorney and knew best?

HURN: (Laughs) I never thought [my attorney] knew best. I thought that he was all I had, since I couldn't get rid of him when I didn't feel he was doing an adequate job. When he said that I couldn't—[that] I wasn't going to testify, I thought that was all there was to it.

Question: Did you tell him that you wanted to testify at that time?

HURN: I told him I thought it was necessary.

Question: All right, and then he told you that he thought he'd already proved self-defense. Did you tell him then that you wanted to testify at that time?

HURN: No, I didn't put it in those words. I thought I'd already made myself clear.

Question: You thought it was important that you testify, you've said that before. Did you tell him at that time that you wanted to testify?

HURN: No.

Question: When [your trial attorney] went back into court with you and told the court that you wouldn't testify—do you remember what he told the court?

HURN: No.

Question: Do you remember him telling the court that, because the State's case was so weak, you wouldn't be a witness?

HURN: That sounds about right....

. . . . .

Question: Did you ever have any discussions with [your attorney] about wanting to reopen the defense case and be a witness yourself?

HURN: No. I didn't know you could reopen a case that had been rested. I also didn't know that it was my decision. I was going on the assumption that when [my

attorney] said I wasn't going to testify, that that's all there was to it.

At the subsequent hearing on Hurn's petition for post-conviction relief, Hurn reiterated that he had wished to testify but that his trial attorney had told him not to. Hurn also stated that no one had ever told him he could ultimately make the decision whether to take the stand, regardless of the wishes of his attorney.

Hurn's trial attorney's version of events and his conversations with Hurn differed significantly from Hurn's testimony. At a pre-hearing deposition, the attorney testified that, even before trial began, he and Hurn had conversations concerning whether Hurn would testify. According to Hurn's trial attorney, no firm decision was reached at these early discussions, but he and Hurn anticipated that Hurn would, in fact, testify. The attorney and Hurn reviewed this decision approximately every other day during the two-week trial.[3]

Hurn's attorney testified that Hurn preferred not to take the stand if he could avoid it:

[TRIAL ATTORNEY]: Mr. Hurn said that he did not want to testify because it made him nervous, but he was willing to testify.

Question: Do you recall him saying . . . anything other than that . . . on the subject of [his] being a possible witness?

[TRIAL ATTORNEY]: I don't think so. I think that [this position] was his—what he expressed to me throughout the trial.

Question: . . . That he did not want to testify because it made him nervous, but he was willing to testify if you so advised him?

[TRIAL ATTORNEY]: Right. Again, those aren't exact words, but that's—The other thing I should clarify [is that] it's not fair to just say [that] he didn't want to testify because he was nervous. I mean, that's making it [overly] simple; there's a lot more to it than that. But the bottom line is, he was willing to testify if I advised him it was necessary, or I thought it was

necessary. I think that's more accurate. But he also was not gung-ho; [he was not saying,] "Let me up on the stand and, by golly, I'm going to tell these folks a thing or two."

By Friday afternoon, February 23, near the end of the defense case, Hurn's trial attorney was "strongly leaning" toward the position that Hurn should not testify:

[TRIAL ATTORNEY]: I thought the State's case had some problems. I thought that [the] cross-examination of the State's [three main] witnesses . . . had showed that they were not being truthful. I had confidence . . . that the jury would . . . look at all the evidence. And I thought that it would be possible for Mr. Hurn to hurt his case more than help it if he testified.

Question: Did you convey any of those thoughts to Mr. Hurn that afternoon?

[TRIAL ATTORNEY]: I believe I did. I believe that those are the matters we discussed Friday afternoon.

Hurn's attorney testified that he reached his final conclusion about whether Hurn should testify during the recess that was called following the testimony of the expert witness on Monday, February 26:

[TRIAL ATTORNEY]: I believe that I didn't make up my mind until—I thought we took a break before coming back and announcing that we rested, and I believe it was during that break.

Question: And did you, during that break, discuss the issue with Mr. Hurn?

[TRIAL ATTORNEY]: I believe I did. . . . I told Mr. Hurn that I didn't think it was necessary for him to testify, and that I didn't think he should testify. Now, I can't say [that] those [were] my exact words, but that was . . . the message I conveyed.

Question: . . . [W]hat, if any, response [did Mr. Hurn make] to those admonitions . . .?

[TRIAL ATTORNEY]: I don't recall his response. . . . The only thing I can recall,

3. The trial began on Monday, February 12, 1990. Opening statements were given on Friday, February 16. The final defense witness (Haag) testified on Monday, February 26.

I believe that he simply accepted my advice.... I don't recall any protest. But I don't recall any [statement like] "Gee, that's great," ... either.

Hurn's attorney testified that he knew that, under the division of authority between attorney and client, a defendant has the final say on whether to testify at trial. However, Hurn's attorney admitted that he never explicitly told Hurn that Hurn had the final say on this matter:

> Question: Do you recall having a specific conversation with Mr. Hurn in which ... you explained to him that he had a right to testify as a witness in his own behalf, but that he could not be forced to testify?
>
> [TRIAL ATTORNEY]: No, ... I don't recall a conversation where I set it out like that.
>
> Question: Do you ... recall [ever] informing Mr. Hurn that there were specific ... [strategic decisions] that you would be responsible for making ... as far as how the case was presented: what witnesses to call, whether to pre-empt a judge, in what order to present witnesses, what exhibits to offer, things like that?
>
> [TRIAL ATTORNEY]: I don't recall any [such] conversation. I'm not saying it happened or it didn't happen. I [just] don't recall any conversation where I sat down with Mr. Hurn and said, "Here's how we divide up what we do."
>
> Question: Do you understand that there is, indeed, a division between those items which are yours [to decide] ... and those which the defendant is responsible for [deciding]?
>
> [TRIAL ATTORNEY]: Yes.
>
> Question: Which ones are those, in your opinion?
>
> [TRIAL ATTORNEY]: Well, I think the defendant has the absolute right to [make the] call on bumping the judge ..., waiver of Rule 45, testifying—whether the defendant testifies or not; and I think I would leave to the client whether we had a jury or not. Those are the ones that ... come to mind.
>
> Question: Now, do you recall ever informing [Mr. Hurn] that, if he wished to testify and you advised against it, he would be allowed to testify regardless?
>
> [TRIAL ATTORNEY]: I don't recall having a conversation like that, where I spelled it out.

Hurn's attorney conceded this same point at the later evidentiary hearing:

> Question: Do you recall Mr. Hurn making any statement, any specific statement [that] he agreed with your opinion with regard to whether he should testify?
>
> [TRIAL ATTORNEY]: No, I don't.
>
> Question: Do you specifically recall advising him that, regardless of your opinion, the decision to testify as a witness was his and his alone?
>
> [TRIAL ATTORNEY]: No.... I don't recall, specifically, the conversation that Mr. Hurn and I had about his right to testify and whose decision that was. [However, as] of the minute before and [at the time] of announcing that we rested, [that] the defense was resting, I did think that Mr. Hurn agreed with my advice that he not testify.

Upon this evidence, Superior Court Judge Charles K. Cranston denied Hurn's application for post-conviction relief. Judge Cranston ruled that, even though Hurn's trial attorney may not have explicitly told Hurn that he could make the final decision concerning whether to testify, this omission had not affected Hurn's decision—because Hurn had, in fact, concurred with his trial attorney that he should not take the stand:

> After the recess, the Court was told[,] in Mr. Hurn's presence, that the testimony of the defendant would not be presented. Half an hour later, this decision was repeated to the jury. The Court finds that the defendant had adequate opportunity during this time to notify his attorney, if not the Court, of any disagreement he may have had with the decision. There is no evidence that he did so.
>
> [Weighing] the defendant's evidence ... of the absence of a knowing waiver ... [,] balanced against [the trial attorney's] statement that he thought that he had complied with the ABA requirement, and Mr. Hurn's [failure to avail himself of the]

opportunity to express his desire to testify after [his attorney's] statement to the contrary before the Court, the preponderance of the evidence does not show that the defendant's failure to testify was the result of his attorney's decision, and not his own.

We agree with Judge Cranston that, even though Hurn's trial attorney never informed Hurn that the decision whether to testify was ultimately Hurn's to make, the attorney's omission makes no difference if Hurn agreed with his attorney's assessment that he should not testify. As can be seen from the quoted portions of Hurn's post-conviction relief testimony, Hurn asserts that he strongly disagreed with his attorney's advice. Hurn testified that he felt it was important for him to take the stand, that he informed his attorney of this, and that he would have pursued the matter further if he had known that the decision rested with him. However, Hurn's attorney testified that Hurn was hesitant to take the stand, even during the early stages of the trial when the defense attorney was in favor of Hurn's testifying. Moreover, Hurn's attorney testified that, during the last day of the defense case, when the final decision was made, Hurn did not express opposition to or disagreement with the attorney's conclusion that Hurn should not take the stand.

Judge Cranston resolved this factual conflict against Hurn. He found that Hurn had not expressed opposition to his attorney's decision, and he inferred from this that Hurn had, in fact, agreed with his attorney at the time. We must affirm Judge Cranston's findings of fact unless we are convinced that they are clearly erroneous. *Anthony v. State*, 521 P.2d 486, 492 (Alaska 1974); *Long v. State*, 772 P.2d 1099, 1101–02 (Alaska App. 1989).

Having examined the record, we can not say that Judge Cranston's findings are clearly erroneous. We therefore affirm Judge Cranston's finding that Hurn concurred in his attorney's assessment that Hurn should not take the stand at his trial. This being so, it does not matter that Hurn was never explicitly told that he had the right to disregard or overrule his attorney's advice.

■ In an alternative argument, Hurn asks us to declare that the rule announced by the Alaska Supreme Court in *LaVigne v. State*, 812 P.2d 217 (Alaska 1991), should be applied retroactively. In *LaVigne*, the supreme court declared that whenever a criminal defendant does not take the stand at trial, the trial judge is under a duty to inquire, before the defense case closes, whether the defendant knows that the decision to testify or not rests with him or her, and to ascertain that the defendant has personally chosen not to testify. *LaVigne*, 812 P.2d at 222. Hurn asks us to rule that this present-day requirement applies to all cases tried before the *LaVigne* rule was promulgated, thus effectively requiring reversal of the conviction of any defendant whose trial judge failed to make the now-required inquiry.

We decline to apply *LaVigne* retroactively. The criteria informing our decision were listed by the supreme court in *Judd v. State*, 482 P.2d 273, 277–78 (Alaska 1971), and reiterated in its opinion on rehearing in *State v. Glass*, 596 P.2d 10 (Alaska 1979):

> The constitution does not require that ... new rules of law be given retroactive effect, *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601, 608 (1965); *Judd v. State*, 482 P.2d at 276, and a court must make an independent decision in each case.... [T]he criteria guiding resolution of the question of retroactivity [are]:
>
> > (a) the purpose to be served by the new standards; (b) the extent of the reliance by law enforcement authorities on the old standards; and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Glass*, 596 P.2d at 13.

The rule announced in *LaVigne* was a new rule of practice, designed to forestall post-trial litigation by requiring the trial judge to make an on-record memorial of a decision that is normally made in private discussions between attorney and client. A failure to comply with the *LaVigne* rule is harmful, not because that failure by itself proves that a defendant's constitutional right was abridged, but because the failure makes it harder to determine the facts underlying the defendant's claim of constitutional violation.

As the Supreme Court of Colorado stated in *People v. Curtis,* 681 P.2d 504 (Colo.1984), when it rejected retroactive application of its own on-the-record inquiry rule:

> While a primary purpose of placing the ... waiver on the record is to improve the accuracy of verdicts, a silent record in a trial [held] before our decision today does not in and of itself raise serious doubts about the accuracy of the guilty verdict.... [W]e believe it likely that retroactive application would be a significant burden on the administration of justice.

*People v. Curtis,* 681 P.2d at 517.

The *LaVigne* rule has not been the favored rule in this country. As this court noted in its opinion, *LaVigne v. State,* 788 P.2d 52, 54 (Alaska App.1990), "Generally, courts seem reluctant to require the trial judge to determine on the record whether the defendant understands his right to testify and ... has ... knowingly and intelligently waived [that right]." Our supreme court departed from traditional jurisprudence on this issue when it joined the ranks of states requiring an on-the-record inquiry. Judges and attorneys can not be faulted for failing to foresee the supreme court's decision, or for failing to foresee the need to make a particularized inquiry into a defendant's decision to refrain from testifying.

The wording of *LaVigne* itself indicates that the supreme court intended its newly-announced rule to be applied prospectively only. The court stated that its rule was designed "[t]o avoid *future* cases like La-Vigne's". *LaVigne,* 812 P.2d at 222 (emphasis added). Moreover, there have been thousands of criminal prosecutions in this state in which the defendant's decision not to take the stand was not memorialized in this way. Retroactive application of the *LaVigne* rule could entail re-opening and potential reversal of a significant number of these prosecutions.

For these reasons, we decline to apply *LaVigne* retroactively. The superior court did not commit procedural error when it failed to address Hurn personally, on the record, to establish that Hurn was knowingly waiving his right to testify. And, because we have previously upheld the superior court's factual determination that Hurn, in fact, concurred in the decision that he should not take the stand at his trial, we therefore affirm the superior court's denial of Hurn's petition for post-conviction relief.

■ Hurn's final argument on appeal is that he received an excessive sentence. Hurn was convicted of second-degree murder, an unclassified felony with a penalty range of 5 to 99 years. AS 11.41.110(b) and AS 12.55.125(b). He was additionally convicted of first-degree assault, a class A felony with a penalty range of 0 to 20 years, and with a presumptive term of 5 years' imprisonment for a first felony offender. AS 11.-41.200(b) and AS 12.55.125(c)(1). *See Pruett v. State,* 742 P.2d 257, 262–63 (Alaska App. 1987). Judge Cranston sentenced Hurn to 40 years' imprisonment with 10 years suspended (30 years to serve) for second-degree murder, and to a consecutive 5–year term for first-degree assault.

■ Hurn challenges the sentence he received for second-degree murder, asserting that it violates the benchmark sentencing range this court established in *Page v. State,* 657 P.2d 850, 855 (Alaska App.1983). *Page* established a benchmark sentencing range of 20 to 30 years' imprisonment for second-degree murder. However, when assessing a second-degree murder sentence under *Page,* this court's emphasis is on a defendant's time to serve. *Jimmy v. State,* 689 P.2d 504, 505 (Alaska App.1984). Hurn received 30 years to serve, a sentence at the upper end of the *Page* benchmark range. Thus, Hurn's sentence does not violate *Page.*

Moreover, Judge Cranston found that Hurn's offense was an aggravated one. He rejected Hurn's self-defense claim, declaring that the facts of the case "clearly expressed" Hurn's "disregard for Mr. Steger's life"; he also found that Hurn's offense was made more serious by the fact that Hurn's actions endangered people other than the two victims named in the indictment.

Hurn relies on several sentencing decisions in which lesser sentences were affirmed for second-degree murder. However, as this court noted in *Arenas v. State,* 727 P.2d 313, 314 & n. 1 (Alaska App.1986), our affirmance of a sentence on appeal means only that we

conclude the sentence is not excessive; it does not set a ceiling on sentences in similar cases, nor does it necessarily mean that we would not have affirmed a greater sentence in the appeal being litigated.

*Arenas* is also relevant to Hurn's sentence appeal because of its facts. The defendant in *Arenas* had become embroiled in a fist-fight with another man, then had pulled a gun and shot him. The jury rejected Arenas's claim of self-defense and convicted him of second-degree murder. This court upheld Arenas's 25–year murder sentence. *Arenas,* 727 P.2d at 315.

Having examined the record in Hurn's case, we conclude that 30 years to serve for Hurn's act of second-degree murder is not clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974). We therefore uphold Hurn's sentence.

The judgement of the superior court is **AFFIRMED.**

BRYNER, C.J., not participating.