**Ralph ADAMS, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–5631.**

Court of Appeals of Alaska.

Nov. 15, 1996.

---

752

Linda K. Wilson, Assistant Public Defender, and John B. Salemi, Public Defender, Anchorage, for Appellant.

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

Ralph Adams was convicted by a jury of first-degree sexual assault, AS 11.41.410(a)(1), and kidnapping, AS 11.41.300(a)(1)(C). Superior Court Judge Dale O. Curda sentenced Adams to a composite term of eighty years in prison with twenty years suspended. Adams appeals, contending that the trial court erred in denying a challenge for cause Adams asserted against a member of his jury. Adams also contends that his conviction should be reversed due to improper final argument by the prosecution. Finally, Adams argues that his sentence is excessive. We affirm.

On December 31, 1992, sixteen-year-old I.B., a Hooper Bay resident, celebrated New Year's Eve in Bethel, attending a dance, a local disco called the Brass Buckle, and then a party at a friend's house. At the Brass Buckle, I.B. began drinking alcohol. Before leaving, she noticed that Adams was at the disco; I.B. recognized Adams because he was the boyfriend of Roberta G., an acquaintance of I.B. Later, at the party, I.B. smoked some marijuana and continued to drink; she became intoxicated. Soon after leaving the party in search of a cab, I.B. blacked out.

When I.B. came to, she found herself on a mattress in a vacant apartment; Ralph Adams lay next to her, urging her to have intercourse with him. I.B. refused. Undeterred, Adams began touching her stomach and her legs, and then touched and inserted his finger into I.B.'s vagina. When I.B. resisted the assault, Adams began beating her on the face and body, calling her names, telling her, "You're a whore like your mom," and saying that he wanted to kill her. I.B. implored Adams to stop, saying, "[W]hat about Roberta?" In response, Adams pulled off I.B.'s spandex tights and used them to choke her and bind her hands. The assault evidently lasted for several hours. I.B. eventually lost consciousness.

When I.B. regained consciousness, it was morning; the sun had risen. She was alone in the apartment. Her hands were still bound and her eyes were swollen from Adams' blows, making it difficult for her to see. The mattress was covered with blood, evidently from a one-inch gash on the back of I.B.'s scalp.

I.B. managed to untie herself and leave the apartment. She walked out to the street and summoned a taxi. I.B. told the driver she had been raped and beaten and that "she knew the man's girlfriend." The driver took her to the Bethel police station, where I.B. reported the rape to Officer Roger Vercelline. I.B. told Vercelline that her attacker was named Ralph and was the boyfriend of Roberta G. I.B. also provided Vercelline with a description of her assailant that eventually proved accurate.

Vercelline took I.B. to the hospital, where the examining physician found her eyes to be "half swollen shut." Further examination revealed extensive bruising on nearly every part of I.B.'s body and face, a lump and one-inch laceration on the back of her head that had probably bled "a fair amount," and bite marks on her buttocks.

After I.B. was released from the hospital later that day, Vercelline conducted another interview, during which I.B. said she did not know who raped her. Upon further questioning, however, she recalled having told Vercelline that her assailant was a man named Ralph who was Roberta G.'s boyfriend. Upon completing his interview with I.B., Vercelline took her to the Bethel Emergency Shelter for Children. There, I.B. told a shelter employee that she had been raped by a man named Ralph who was Roberta G.'s boyfriend.

Investigation of I.B.'s report led Vercelline to a vacant apartment that contained only a blood soaked mattress and a chest of drawers. Vercelline separately determined that Roberta G.'s boyfriend was Ralph Adams, that Adams lived near the empty apartment, and that he had been hired by the apartment building's owner to clean out the apartment.

Vercelline contacted Adams, who appeared to have fresh scratches on his face and body. Adams acknowledged the scratches but could not explain their origin. Adams' clothing appeared to be stained with blood. At first Adams denied that the stains were from blood; then he claimed that they were his own blood—that he had had a nosebleed.

The following day, Vercelline showed I.B. a photographic lineup. I.B. identified Adams. Subsequent testing revealed that the blood on Adams' clothing was not his own but was a type similar to I.B.'s. A thorough search of the mattress in the empty apartment also yielded a pubic hair that appeared to match a hair sample taken from Adams.

Based on this evidence, the state charged Adams with kidnapping and first-degree sexual assault. Adams was brought to trial before a Bethel jury, which convicted him of the charges. Adams then filed this appeal.

On appeal, Adams first contends that the trial court erred in denying his mid-trial motion to disqualify a juror. During the jury selection process, prospective juror Tad Miller disclosed that he was the director of the Bethel Emergency Shelter for Children. Both parties accepted Miller as a juror. In the course of trial, the jury heard evidence that, after the sexual assault, I.B. was taken to the Bethel Emergency Shelter for Children, where she told a shelter worker that she had been raped by a man named Ralph, who was the boyfriend of an acquaintance. Subsequently, when I.B. took the stand, juror Miller recognized her. Miller sent Judge Curda a note, saying:

Upon viewing [I.B.] it occurs to me that I did meet her while she stayed at the receiving home. I never discussed her case with her, however. Does this matter[?]

After disclosing this note to trial counsel, Judge Curda convened a hearing at which Miller was questioned out of the presence of other jurors. Miller told the court that he had not recognized I.B.'s name during the jury selection process; he realized that she had been at the shelter only after seeing her when she took the stand. Miller said that his position as the director of the shelter primarily involved management and administration; he supervised the shelter staff, who in turn provided direct care.

Miller recalled that after I.B. came to the shelter, a staff member telephoned him at home and told him that a new child had been admitted in "physically rough shape." When Miller next went to work, he met I.B. briefly, introduced himself, and welcomed her to the shelter. Miller observed I.B.'s injuries, noticed that she was "very shy," but did not talk to her about the assault. Miller characterized his involvement with I.B. at the shelter as "very minimal" and estimated that I.B. had remained there only "a day or two."

Judge Curda asked Miller whether there was "anything about that contact ... that would make you judge her testimony any differently from anybody else's[?]" Miller answered no. Judge Curda also asked if Miller's contact with I.B. would cause him "[a]ny problems with following th[e] instruction [about evaluating witness testimony]." Again, Miller answered no.

In follow-up questioning, the prosecutor asked Miller if there was any reason he could not be fair. Miller answered: "No. I think I can be fairly objective, but I—I did want to state for the record I had met her ... while she was in my care and I don't know if you feel that's grounds for—for my dismissal, or whatever, but ..."

Defense counsel, for his part, asked if anything about Miller's contact with I.B. at the shelter might "influence you one way or the other?" Miller answered no. Defense counsel also asked if Miller acted in the capacity of guardian for children living at the shelter. Miller said that for "purposes of school enrollment and that kind of thing I [serve as guardian]." He indicated that all residents of the home are in state custody. However, Miller did not think of himself a custodian, but as a "caregiver."

Based on Miller's responses, Adams' counsel moved to have Miller excused from the jury. Counsel asserted two grounds: that the guardian/ward relationship arising from I.B.'s stay at the children's shelter disqualified Miller from service under Criminal Rule 24(c)(10); and that Miller's personal knowledge of facts involved in the case might

preclude him from being fair. Judge Curda denied Adams' motion. Miller went on to become the foreman of Adams' jury.

On appeal, Adams argues that Miller should have been disqualified. Adams asserts the same two grounds he raised below. Neither ground is persuasive.

■ We consider first Adams' argument under Alaska Criminal Rule 24(c)(10). This rule provides, in pertinent part, that any party may challenge a juror for cause on the ground

> [t]hat the person is the guardian, ward, landlord, tenant, employer, employee, partner, client, principal, agent, debtor, creditor, or a member of the family of the defendant [or] ... of the person alleged to be injured by the crime charged in the indictment[.]

Adams argues that Miller, as the director of the children's shelter that had custody and control of I.B., was I.B.'s guardian and was thereby disqualified from jury service under Rule 24(c)(10).

Rule 24(c)(10), however, is worded in the present tense; it applies only when a person called as a prospective juror "is" a guardian of the victim. When read in accordance with its plain meaning, this rule has no application to past guardian/ward relationships.

Adams provides no legislative history, case law, or persuasive reasons to support the conclusion that Criminal Rule 24(c)(10) should be interpreted to extend beyond its apparent plain meaning. Moreover, at least one decision of the Alaska Supreme Court interpreting the use of the words "debtor" and "creditor" in the civil counterpart of Criminal Rule 24(c)(10)—Civil Rule 47(c)(10)—strongly suggests that the criminal rule's present-tense phrasing should be read literally. *Malvo v. J.C. Penney Co.*, 512 P.2d 575, 579 (Alaska 1973) (requiring dismissal under the "debtor-creditor" wording of Civil Rule 47(c)(10) only of jurors with "outstanding" balances on their accounts at appellee's stores).

We conclude that Adams' case must be governed by the plain meaning of Criminal Rule 24(c)(10): Adams was entitled to challenge Miller for cause only if Miller was I.B.'s guardian at the time of trial. Even though Miller had arguably acted as I.B.'s guardian while she stayed at the shelter, it is undisputed that I.B. was not at the shelter when Adams' case was tried. Because there was no basis for the trial court to find a guardian/ward relationship in existence at the time of Miller's selection as a juror, it follows that there was no cause for Miller's disqualification under Rule 24(c)(10).

Adams alternatively argues that Miller should have been excused for cause because he had personal knowledge of facts relating to Adams' case. Under the standard articulated in *Dalkovski v. Glad*, 774 P.2d 202, 205 (Alaska 1989), a juror's personal knowledge of the facts of a case will give rise to a valid challenge for cause when it

> prevents the juror from rendering an impartial verdict based solely on the evidence presented at trial. "Knowledge by a juror of incidental or collateral facts ... will not render him incompetent to sit in the trial of a case."

*Id.* (quoting *Wells v. Autry*, 235 So.2d 706, 708 (Miss.1970)). Once it is established that a juror is personally aware of facts that are material, that is, not merely "incidental or collateral," a strict rule applies:

> A juror with any material knowledge of the facts in the case on trial should be excused for cause *unless it is beyond question* that such juror can try the case and return a verdict only on the evidence introduced in the courtroom.

*Dalkovski*, 774 P.2d at 206 (quoting Walter E. Jordan, *Jury Selection* § 5.15, at 83 (1980)).

■ In the present case, virtually the only facts Miller learned by virtue of his prior contact with I.B. related to I.B.'s physical and emotional condition upon her arrival at the children's shelter. While these facts might be material in some contexts, they were plainly collateral in the context of Adams' case: Adams' defense was based on mistaken identity; he acknowledged that I.B. had been sexually attacked by someone, claiming only that I.B. had misidentified her assailant.

Adams nonetheless argues that Miller's encounter with I.B. might have influenced Miller's perception of her credibility—a key issue in his case. This argument, however, mistakenly assumes that all facts are material to credibility when credibility is in issue. Almost anything a juror knows about a case could conceivably influence that juror's perceptions of a witness' credibility. But this does not mean that any juror with knowledge—however insignificant—about a case must be disqualified when credibility is in dispute. Rather, *Dalkovski*'s stringent standard of dismissal comes into play only when the juror is aware of facts that have a direct bearing on credibility; facts collaterally or incidentally related to credibility are not material to that issue.

Here, none of the facts known to Miller had any direct bearing on the issue of I.B.'s credibility. If the facts known to Miller by virtue of his contact with I.B. had any bearing at all on I.B.'s credibility as a witness, that bearing was at most collateral or incidental. The record fails to establish that Miller's personal contacts with I.B. resulted in any "material knowledge of the facts in the case on trial." *Dalkovski*, 774 P.2d at 206. Hence, there was no basis for his automatic dismissal.[1]

■ Adams next claims that he is entitled to a reversal of his conviction because the prosecutor's final argument dealt with facts not in evidence. Since Adams failed to object to the prosecution's final argument, reversal will be justified only if the final argument rises to the level of plain error. *Garroutte v. State*, 508 P.2d 1190, 1191 (Alaska 1973); *Potts v. State*, 712 P.2d 385, 390 (Alaska App.1985). "A plain error is one that is (1) so obvious that it must have been apparent to a competent judge and a competent lawyer even without an objection and (2) so substantially prejudicial that failing to correct it on appeal would perpetuate a miscarriage of justice." *Potts*, 712 P.2d at 390. On

appeal, we must consider whether the impropriety was so flagrant as to "undermine the fundamental fairness of the trial." *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). A finding of plain error is rarely appropriate unless the record rules out the possibility that trial counsel's failure to object to an improper argument was tactically motivated. *Massey v. State*, 771 P.2d 448, 453 (Alaska App.1989).

■ Here, Adams points to three factual matters discussed by the prosecutor but not supported by the evidence. The first unsupported factual reference involves the prosecutor's mention of AIDS on two occasions in his final argument. In the opening portion of his final argument, the prosecutor sought to depict Adams' assault on I.B. as the act of a "predator." To this end, the prosecutor described the various acts of gratuitous violence Adams inflicted on his victim:

> He gets her in there, he beats the holy hell out of her, sticks his fingers in her vagina, calls her names, calls her a whore, tells her that he hopes he gives her AIDS, and then ties her up, chokes her. Beats her about the face, leaves her with two black eyes[.]

In the rebuttal portion of his final argument, the prosecutor, responding to Adams' assertion that I.B.'s ability to identify her assailant might be impaired by her intoxication at the time of the assault, emphasized I.B.'s detailed memory of events:

> You heard from [I.B.] that she looked up and she saw Ralph Adams on top of her and the first thing she said was, no, no, what about Roberta, what about Roberta? And she describes with detail the fact that he called her a whore, that he told her he hoped she got AIDS, that he wanted to kill her.

These two prosecutorial references to Adams' statement that he hoped I.B. got AIDS were unsupported by the evidence at trial. In her testimony before the grand

1. Adams also argues that Miller's assertions of impartiality were at some points ambiguous; relying on *Dalkovski*, he contends that dismissal was required unless his answers established his ability to be fair "beyond question." When read in their entirety, however, Miller's responses seem to constitute a reasonably unequivocal assertion of impartiality. In any event, as we point out in the text of this decision, *Dalkovski*'s stringent standard of automatic dismissal absent proof "beyond question" of a juror's ability to be impartial is triggered only upon a threshold showing that the juror is aware of material facts in the case.

jury, I.B. had described such a statement; however, the prosecution neglected to cover the issue when I.B. testified at trial.

Citing *Chizmar v. Mackie*, 896 P.2d 196, 205 (Alaska 1995), for the proposition that "[t]he significance of a false imputation of AIDS is unquestionable," Adams contends that the prosecutor's unsubstantiated mention of AIDS is plainly prejudicial and amounts to reversible error. However, Adams' reliance on *Chizmar* is misplaced. In that case, the court addressed only the question whether the plaintiff could recover damages for emotional distress caused by a physician's misdiagnosis of AIDS; *Chizmar's* discussion of the effects of a medical misdiagnosis on a patient has little bearing on the plain error issue here.

In the present case there is no indication of an intentional misstatement by the prosecution. On both occasions when the prosecutor referred to Adams' comment that he hoped he gave I.B. AIDS, the comment was mentioned as one among many acts of gratuitous physical and psychological cruelty that Adams inflicted on his victim; no attempt was made to give Adams' comment about AIDS prominence over any of Adams' other acts. Nor did the prosecutor say anything to indicate to the jury that Adams actually had AIDS or that I.B. had been exposed to the AIDS virus. In context, the jury was likely to give no more credence to the possibility that Adams actually had AIDS than it was apt to give to the underlying assertion of Adams' statement calling I.B. "a whore just like your mother."

Even more significant on the issue of prejudice is that the prosecutor's unsupported references to AIDS, while attributed to Adams as the purported assailant, had no tendency to establish that Adams was the assailant. Had Adams' defense been based on a claim of consent, for example, the potential prejudice of the unsubstantiated references might indeed have been significant. But Adams' defense was based on a claim of mistaken identity; Adams did not dispute I.B.'s account of the manner in which the sexual assault occurred. For this reason the prosecutor's improper mention of AIDS risked prejudicing the jury if, but only if, the

jury was already prepared to reject Adams' claim of mistaken identity and find him guilty of being the assailant.

Conversely, Adams' trial counsel had no particular reason to dispute the prosecutor's infusion of additional, untestified-to details into I.B.'s version of sexual assault, provided that the additional details were not calculated to focus suspicion on Adams or to dilute his claim of mistaken identity. Because the prosecutor's misstatements concerning AIDS were offender neutral and had no tendency to erode Adams' claim of mistaken identity, Adams' counsel may well have made a tactical decision to forgo any objection to the impropriety.

These circumstances fail to establish obvious prejudice warranting a plain error finding.

■■ The second unsupported factual reference pointed out by Adams involves the prosecutor's statement that I.B. was kicked by her assailant:

Now Ralph Adams wanted the police to believe that that was his blood. He told the police he got a nosebleed and that's why he had blood on his pants.... Ralph Adams borrowed the nosebleed because he knew that after he beat up [I.B.] she had a nosebleed, and that nosebleed was seen by the cab driver that picked her up, and it was also noticed by the doctor who examined her. Now that's the blood, that nosebleed is the blood on his pants and the blood on the sleeve. It's the blood that got on his sleeve from when he punched her in the nose.... His clothed arm comes in contact with her blood and that's where it ends up. He also kicks her. [I.B.] talked to you about being kicked. That's how the pants—the blood gets on the pants....

Though unsupported by I.B.'s trial testimony, the prosecutor's assertion that Adams kicked his victim added nothing particularly significant to the prosecutor's case. Given the undisputed evidence that I.B. bled profusely during the assault, the unsupported assertion of direct contact between Adams' leg and I.B. was not even remotely necessary to explain the presence of I.B.'s blood on Adams' pant leg. Indeed, in the same breath

as the prosecutor mentioned the unsubstantiated kicking, he also proposed a proper, equally plausible explanation for the presence of blood: that I.B.'s nose bled directly onto Adams' pant leg. We fail to see how this misstatement could have resulted in substantial prejudice.

■ The third unsupported factual reference pointed to by Adams involves the prosecutor's claim, in the opening segment of his final argument, that I.B. identified her assailant to the physician who examined her in the emergency room and to the grand jury;[2] on rebuttal, the prosecutor repeated the assertion that I.B. had identified Adams to the grand jury.[3]

These misstatements, however, are clearly immaterial. The evidence at trial established that, apart from the post-emergency room interview with Officer Vercelline when I.B. was unable to say who her attacker was, I.B. had consistently identified Adams. Immediately after the rape, I.B. told the taxi driver that "she knew [her attacker's] girlfriend." A short time later, I.B. told the investigating officer that "the person that had ... beaten ... and had sexually assaulted her was— Robert[a] [G.]'s boyfriend and that his first name was Ralph." Later that day (after she was seen by the emergency room doctor to whom she confided that she had been raped but did not disclose the identity of her attacker), I.B. told a shelter worker that her assailant was a man named "Ralph" who was Roberta G.'s boyfriend. The next day, I.B.

picked Adams out of a photo lineup. Finally, she testified at trial that Adams was the man who assaulted her.

Furthermore, the prosecutor's misstatements do not appear to have been intentional. I.B. did in fact testify to the grand jury that Ralph Adams was her assailant; at trial, she affirmed that she had told the grand jury her "story," a statement arguably supporting the inference that she had identified Adams as her assailant. And while the prosecutor mistakenly told the jury in the opening portion of his final argument that I.B. had identified Adams to the physician at the emergency room, he did not repeat this mistake on rebuttal. On rebuttal, the prosecutor accurately informed the jury that I.B. told the emergency room physician that she had been raped.

Finally, it is worthy of mention that, at the outset of his rebuttal argument, the prosecutor expressly reminded the jury that statements by counsel were not evidence and that the jury should rely on its own recollection.

In sum, the three areas in which the prosecutor's final argument was unsupported by the evidence at trial are not "particularly egregious errors." *United States v. Young*, 470 U.S. at 15, 105 S.Ct. at 1046 (quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). These misstatements do not appear to have involved intentional misstatements;[4] and

2. In the opening segment of his final argument, the prosecutor stated:

[L]et's look at the identity evidence that we've had here today.... You heard [I.B.] come in here and sit up here ... and ID Mr. Adams.... She said that to you and there was evidence that she said that to the grand jury and there was evidence that she said that to Roger Vercelline [the investigating officer] when he first talked to her.... [T]hat's hearsay, because Roger heard her say that, but it's such good hearsay that the court allows that in, and it's the same when she goes up to the hospital and she tells the doctor what happened to her. That evidence comes in because at the time she says it she's under the stress and excitement of what happened to her and the law finds that when someone says that sort of thing under the stress and excitement of an event that it's good evidence.

She's [sic] ID's Ralph ... to Roger and the doctor.... She ID's Mr. Adams so much she

describes he was wearing tinted glasses.... The next day ... she picks him [out of a photo lineup].

3. The prosecutor stated on rebuttal:

She tells the cab driver she's been raped, she tells Officer Vercelline she's been raped by Ralph. She goes up to the hospital[,] tells the doctor she's been raped, she comes back.... The next day they go out and talk to her, she says it was Ralph Adams, and she picks his picture out of that lineup. She comes to the grand jury. Who did it to you? Ralph Adams. She comes to the jury trial. Who did it to you? Ralph Adams[.]

4. In this regard, Adams' reliance on I ABA Standards for Criminal Justice 3–5.8 and 3–5.9 (2d ed.1980) is misplaced for this standard refers to intentional misstatements of the evidence, providing that "[it is] unprofessional conduct for the

whether considered individually or in conjunction with one another, they did not result in substantial prejudice to Adams. Under these circumstances, in the absence of a timely objection, we decline to find plain error.[5]

■ Adams lastly claims that his sentence is excessive. Kidnapping, an unclassified felony, is punishable by a maximum term of ninety-nine years and by a minimum term of five years. AS 12.55.125(b). Sexual assault in the first degree, also an unclassified felony, is punishable by a maximum term of thirty years; because Adams was a third felony offender, he was subject to a presumptive sentence of twenty-five years. AS 12.55.125(i)(4).

Adams was 30 years old at the time of the offense. His criminal history began in 1980, when, at 17 years of age, he was declared a delinquent child after physically assaulting one woman and attempting to sexually assault another. Adams remained in state custody until his 18th birthday. Seven months later, in May 1981, he was convicted of attempted third-degree sexual assault and was sentenced to serve 270 days with 180 suspended.

In September 1981, four months after the attempted sexual assault conviction and while he was still on probation in that case, Adams broke into a Sheldon Point residence that was occupied by a man and a woman. He confronted the man with a handgun and threatened to shoot him if he did not leave. After forcing the man out, Adams proceeded to rape the woman. As he left the residence, Adams told his victim, "See you again sometime."

While awaiting trial for that sexual assault, Adams escaped from the Bethel jail, broke into a home, and committed a felony theft. When finally apprehended, he was armed with a knife.

Based on the foregoing misconduct, Adams was convicted in July of 1982 of first-degree sexual assault, second-degree theft, and escape. With respect to Adams' sexual assault, the presentence report noted that four Sheldon Point women other than the victim whom Adams was convicted of assaulting had complained of recent sexual assaults or attempted sexual assaults by Adams. Some of the complainants, including an aunt of Adams, reported being assaulted repeatedly; the assaults often involved threats of death and significant physical violence.[6]

As a result of his 1982 convictions, Adams ultimately received a composite sentence requiring him to serve eight and one-half years of unsuspended time. Soon after completing his incarceration, in June of 1989, Adams was convicted of a new offense: criminal trespass. He was ordered to serve an additional year in jail. Adams committed his present offenses against I.B. approximately a year and a half after the expiration of the criminal trespass sentence.

In sentencing Adams for his current offenses, Judge Curda found nine statutory aggravating factors.[7] Based on Adams'

---

prosecutor intentionally to refer or to argue on the basis of facts outside the record[.]"

5. Adams mistakenly cites *Pritchard v. State,* 673 P.2d 291 (Alaska App.1983), as a case analogous to his. In contrast to Adams' case, however, *Pritchard* involved a final argument in which the prosecutor intentionally stated facts outside the evidence, whereupon Pritchard's trial counsel interposed a timely objection.

6. One woman reported that Adams had attempted ·to rape her on two occasions: in 1979, he beat her up, tore her clothing, and attempted to rape her; in 1981, he attempted to gain entry into her home in the middle of the night, but she dissuaded him by firing a gun out the window. Another woman reported that she had been raped by Adams four times during the preceding

four years; she stated that on one occasion, Adams had beaten and raped her in front of her five children. She indicated she had not reported the incidents due to Adams' threats to kill her if she did. A third woman reported that Adams had come into her house when she was intoxicated and attempted to remove her clothes. Finally, a fourth woman, Adams' aunt, reported that Adams had sexually assaulted her three years before by climbing into bed with her, removing her clothes and raping her. She reported that Adams had assaulted her on another occasion as well.

7. Judge Curda found that Adams had previously been adjudicated a delinquent for conduct that would have been a felony if committed by an adult. AS 12.55.155(c)(19). The judge concluded that this factor deserved independent weight.

background and the seriousness of his current offenses, Judge Curda found Adams to be a worst offender. Judge Curda also pointed out that Adams' criminal history revealed a "consistent pattern," starting when he was a juvenile, of "physical force, brutality, physical beatings, threats with a dangerous weapon, verbal threats of imminent death, and threats and intimidation designed to discourage reporting of crimes[.]" Finally, Judge Curda noted that Adams had consistently denied any wrongdoing, "not only in this case but in prior cases."

Based on these considerations, Judge Curda found that Adams' potential for rehabilitation was "practically nil" and that "he does need to be isolated to protect the community." The judge remarked that his "primary goal here in sentencing is to isolate Mr. Adams from the community."

After giving express consideration to the benchmark sentences for kidnap/rape cases discussed by this court in *Williams v. State,* 800 P.2d 955, 958–60 (Alaska App.1990), *modified on reconsideration,* 809 P.2d 931 (Alaska App.1991), Judge Curda concluded that Adams belonged in the third benchmark category—the category reserved for a "handful" of "persistent violent criminals" for whom composite terms in excess of thirty years of unsuspended time are necessary.

For Adams' sexual assault, Judge Curda imposed the maximum sentence of 30 years' imprisonment. For the kidnapping, the judge imposed a consecutive sentence of 50 years with 20 years suspended (30 years to

serve). Adams' composite sentence is thus 80 years with 20 suspended.

On appeal, Adams does not dispute any of the individual aggravating factors relied on by Judge Curda; nor does he contend that the sentencing court erred in placing him in *Williams'* third benchmark category. Rather, Adams argues that his composite sentence is too long when compared with other similarly situated offenders. Adams attempts to distinguish his case from *Contreras v. State,* 767 P.2d 1169 (Alaska App. 1989), the case Judge Curda found comparable to Adams'. Adams points out that Contreras' composite term of sixty-five years of unsuspended incarceration, which this court upheld, was imposed for six separate criminal episodes. In relying on this factor to suggest that his case is less serious than Contreras', however, Adams disregards the peculiar significance of his own history of persistent violent sexual criminality—a factor not present in *Contreras* that more than offsets Contreras' multiple convictions.[8]

In *Ross v. State,* 877 P.2d 777 (Alaska App.1994), we approved a virtual lifetime sentence—eighty-four years of unsuspended incarceration without eligibility for parole—for a second felony offender whose previous conviction was for sexual assault and who stood convicted of two new incidents of sexual assault, one of which involved a kidnapping. We noted in *Ross* that "[o]ur approval of virtual lifetime sentences for offenders in this category has typically been based on our

---

The judge found eight other factors that he merged into two categories. In the first category, Judge Curda placed four factors that went to the seriousness of Adams' conduct: a person sustained physical injury as a result of the defendant's conduct; the defendant's conduct during the offense manifested deliberate cruelty to another person; the defendant knew, or reasonably should have known, that the victim was particularly vulnerable or incapable of resistance; and the conduct constituting the offense was among the most serious conduct included in the definition of the offense. AS 12.55.155(c)(1), (2), (5), (10). In the second category, Judge Curda placed four factors involving aspects of Adams' adult criminal history: the defendant's prior criminal history included conduct involving aggravated or repeated instances of violent behavior; the defendant had three or more prior felonies; the defendant had committed prior sexual

assaults; and the defendant's prior criminal history included criminal offenses similar to the charged offense. AS 12.55.155(c)(8), (15), (21), and former AS 12.55.155(c)(18)(C).

8. Adams also cites *Massey v. State,* 771 P.2d 448 (Alaska App.1989), and *Wortham v. State,* 689 P.2d 1133 (Alaska App.1984), as cases comparable to his own. In both decisions we approved shorter sentences than Adams' for repeat offenders convicted of kidnap/robbery offenses. Adams' proposed comparison is not compelling because those cases did not involve kidnap/rape situations. Moreover, we have frequently noted that an affirmance of a sentence on appeal means only that the sentence is not excessive; it does not set a ceiling on sentences in other similar cases or mean that a lengthier sentence would not have been approved. *See, e.g., Hurn v. State,* 872 P.2d 189, 199–200 (Alaska App.1994).

finding of an 'ingrained, compulsive criminal pattern.' " *Id.* at 782 (quoting *Schuenemann v. State,* 781 P.2d 1005, 1009 (Alaska App. 1989)). We went on to observe that "the nature of the past and current crimes can be as telling an indicator of an 'ingrained, compulsive criminal pattern' as a lengthy history of prior convictions." *Id.* We concluded that "even a relatively limited criminal history can justify a worst-offender finding ... when a defendant's past and current crimes consist of repeated acts of serious sexual assault that are separated by a substantial period of incarceration but, apart from incarceration, occur in close proximity." *Id.* (citing *Coleman v. State,* 621 P.2d 869, 885 (Alaska 1980)).

The nature and seriousness of Adams' past and current offenses clearly place him in the same exceptional class of ingrained, persistent sexual offenders that we found suitable for Ross. Although Adams' current offenses stem from a single criminal episode involving one victim and are thus arguably less egregious than the two separate incidents of sexual assault for which Ross was sentenced, Adams' history of predatory sexual misconduct is more extensive than Ross', and Adams' composite sentence of eighty years with twenty suspended, with no parole restriction, is certainly less stringent than the unsuspended eighty-four-year parole-restricted term we approved for Ross.

The record in the present case fully supports Judge Curda's finding that Adams is a worst offender whose prospects for rehabilitation are virtually nil and who must therefore be isolated from the community to ensure public safety. Having independently reviewed the entire sentencing record, we cannot say that the sentence imposed below is clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).

Accordingly, Adams' conviction and sentence are AFFIRMED.