Byron Keith **COOPER**, Appellant,

v.

The **STATE** of Oklahoma, Appellee.

No. F–92–533.

Court of Criminal Appeals of Oklahoma.

Jan. 10, 1995.

Rehearing Denied Feb. 13, 1995.

As Clarified March 24, 1995.

Robert A. Ravitz, Public Defender, Robert Mildfelt, Asst. Public Defender, Oklahoma City, Trial Counsel for appellant.

Brad Miller, Kayce Gisinger, Asst. Dist. Attys., Oklahoma City, Trial Counsel for appellee.

Pamela Wagner, Asst. Public Defender, Oklahoma City, Appellate Counsel for appellant.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, Appellate Counsel for appellee.

## *OPINION*

LUMPKIN, Presiding Judge:

Appellant Byron Keith Cooper was tried by jury and convicted of Murder in the First Degree (21 O.S.Supp.1989, § 701.7) in the District Court of Oklahoma County, Case No. CF–89–5084. The jury found the existence of five (5) aggravating circumstances (Appellant was previously convicted of a felony involving the use or threat of violence; the murder was especially heinous, atrocious and cruel; the murder was committed to avoid arrest or prosecution; the murder was committed while Appellant was serving a sentence for a conviction of a felony; and Appellant posed a continuing threat to society) and recommended punishment of death. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal. We affirm.[1]

## I. FACTS

Eighty-six-year-old Harold Sheppard was found dead in his home at Northeast 13th and Fonshill streets by a friend who was helping him with plans to renovate his home. The victim's wife had died years earlier and his daughter lived in another state. Mr. Sheppard lived only with his little dog, which authorities found protecting the victim's body. He was found on September 8, 1989; based on interviews with people in the neighborhood, authorities estimate he died on September 4, after being stabbed to death that same evening.

A former cocaine dealer who sold drugs in the area frequented by Appellant witnessed Appellant's arrest by detectives on September 19. The dealer testified that a week or two before the arrest, Appellant had approached him, showed him a credit card with someone else's name on it, and offered to purchase merchandise in exchange for cocaine. The dealer could not remember the name on the credit card, but remembered the

first name started with "H." The dealer initially refused; but after Appellant persisted, said he could use a watch. A short time later that same day, Appellant returned with a gold Seiko watch. An acquaintance who happened to be present during the exchange said he wanted a watch, too. Appellant told him he would get him one.

On September 5, the day after Mr. Sheppard was killed, Appellant used Mr. Sheppard's J.C. Penney credit card to purchase watches. One watch, a gold Seiko, was bought at the J.C. Penney store in Shepherd Mall; the other at the Penney store in Crossroads Mall. Both were purchased the same day. Authorities became aware of the purchases less than two weeks later, when the victim's daughter received the bill for the purchases. The clerk at the Shepherd Mall store remembered the purchase at her store. In fact, she was suspicious because Appellant did not look like the kind of customer to whom Penney would issue a credit card. She attempted to call Harold Sheppard, the name on the card, during the remainder of the week; no one ever answered the telephone. She later gave authorities Appellant's description and a composite drawing, which was distributed to law enforcement personnel.

On September 19, detectives spotted Appellant in the vicinity of Northeast 4th and Laird. When they turned their car around to investigate further, Appellant began running from them. When he was apprehended a short time later, he was carrying a portion of a car antenna commonly used as a pipe to smoke crack cocaine.

Appellant was questioned by authorities for several hours. During the interrogation, Appellant admitted murdering not only Harold Sheppard, but also Monteen Warner, whose body was discovered on September 17, 1989 at her home at 1021 Northeast 6th Street (evidence of the Warner homicide was not presented until the second stage). However, Appellant also retracted the admissions, and denied being inside either residence. Appellant denied being involved in a murder at 13th and Fonshill, despite the fact detectives had not told him Mr. Sheppard's

---

1. In so doing, we note the following: this case was filed December 7, 1992; it was fully briefed and at issue April 4, 1994; and it was submitted to this Court on May 4, 1994.

house was located at that intersection and despite the fact Appellant told the detectives he had not heard anything about the murders in the news media. Toward the end of the interview, Appellant conceded he may have committed the murders, but could not remember.

Appellant had been staying with Walter Sam Ray, a man he met in prison. At that apartment, authorities found two box-type cameras which Mr. Sheppard's daughter identified as belonging to her father. Also found at the apartment was a watch which had belonged to Mr. Sheppard. Using chemical reagents, technical investigators discovered traces of blood on a shoe, sock and blue jeans, all belonging to Appellant and all found in a box of Appellant's belongings in Ray's apartment. Two hairs which were microscopically consistent with Mr. Sheppard were also found on one of Appellant's shoes found at the apartment.

At Mr. Sheppard's house, authorities found Appellant's fingerprints on a flashlight, a metal can, a watch case, and a carton of Salem cigarettes, the brand Mr. Sheppard smoked. Appellant's prints were also found on the charge receipt he signed at the Shepherd Mall J.C. Penney store. Authorities found a Viceroy brand cigarette butt on the kitchen floor. Appellant had a pack of Viceroy brand cigarettes when he was apprehended. Appellant is a non-secretor, meaning his blood type cannot be discovered in other bodily fluids such as saliva. No blood type could be detected from the Viceroy cigarette butt, indicating that if saliva were left on it, the person who did so could be a non-secretor.

Appellant in the police interview could not explain how his fingerprints could have been placed on the items in Mr. Sheppard's house. However, he did say if he had killed the man, his prints should have been found on the weapon, and he was certain they would not be. Authorities found a butcher knife in the draining board in the victim's kitchen. No prints were found on the knife, and there was no visible blood; however, when a chemical reagent was sprayed on the knife, the blade exhibited swipe marks which would be exhibited if blood on the blade had been wiped off.

## II. PRE-TRIAL ISSUES

### A.

■ For his first proposition, Appellant complains the authority used to determine competency is unconstitutional. A sizeable portion of pretrial proceedings focused on Appellant's competency. His attorneys complained he would not communicate with them and that he thought his lead attorney was a devil who wanted him dead. A non-jury competency hearing was afforded Appellant in December 1990 and January 1991 pursuant to sections 1175.1 through 1175.8 of Title 22, at the conclusion of which Appellant was adjudged competent to stand trial.

Appellant acknowledges a hearing was held, but complains the presumption of competency, combined with the requirement he show incompetency by "clear and convincing" evidence, 22 O.S.Supp.1985, § 1175.4(B), is such a harsh standard it is violative of his right to Due Process of Law. He argues the standard of proof on him should have been preponderance of the evidence.

■ It is a basic precept that statutes are presumed to be constitutional and the person alleging their unconstitutionality has the burden of proof. *Newton v. State*, 824 P.2d 391, 396 (Okl.Cr.1991); *State v. Hunter*, 787 P.2d 864, 865 (Okl.Cr.1990); *Nunley v. State*, 660 P.2d 1052, 1056 (Okl.Cr.1983), *cert. denied*, 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 179 (1983).

The statutory reference to "competency" covers two requirements: a defendant must have sufficient ability to consult with an attorney; and the defendant must be able to understand the nature of the charges and proceedings being brought against him. 22 O.S.1981, § 1175.1. The question of a defendant's competency can be raised by the defendant, his attorney, the prosecutor or even the court; however, it must state facts "sufficient to raise a doubt" in the court's mind of the defendant's competency. Any such application and sufficient notice must be provided the defendant and must contain certain facts and rights. 22 O.S.Supp.1983, § 1175.2. Once such an application is filed, the court

must hold a hearing to examine the application. The court may also entertain other evidence pertinent to the question at that hearing. A court finding merit to the application must order an examination by doctors or appropriate technicians, who shall examine the defendant and determine if he can appreciate the nature of the charges; if he is capable of assisting his attorney; and other questions concerning the attainment of competency (if incompetent), whether the defendant is mentally ill, and whether he poses a threat to himself or others if released without treatment. 22 O.S.Supp.1990, § 1175.3. Following an initial determination by doctors or technicians and upon application, the court is required to hold a hearing on the competency issue. At that hearing, the defendant is presumed competent, and must prove by clear and convincing evidence he is incompetent. 22 O.S.Supp.1985, § 1175.4.

*Medina v. California,* 505 U.S. ——, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992) is dispositive of Appellant's argument he cannot be presumed competent. *Id.* at ——, 112 S.Ct. at 2575, 120 L.Ed.2d at 363 ("Based on our review of the historical treatment of the burden of proof in competency proceedings, the operation of the challenged rule, and our precedents, we cannot say that the allocation of the burden of proof to a criminal defendant to prove incompetence 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" (quoting *Patterson v. New York,* 432 U.S. 197, 202, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977)).

In *Medina,* the criminal defendant bore the burden of proving his incompetency by a preponderance of the evidence. Oklahoma law requires he prove his incompetency by clear and convincing evidence. To determine whether this offends notions of Due Process requires some discussion of allocation of proof and fundamental concepts of Due Process.

■ Exactly what "due process" is has never been satisfactorily defined. This Court has stated it is "older than written Constitutions," and the phrase "is synonymous with 'law of the land' as found in Magna Carta." It then concluded the phrase

"intended the general law which reads before it condemns, which proceeds upon inquiry and renders judgment only after trial. It means that every citizen shall hold his life, liberty, and property under the protection of the general rules which govern society." *Ex Parte Hollins,* 54 Okl.Cr. 70, 75, 14 P.2d 243 (1932); *see also Dartmouth College v. Woodward,* 4 Wheat. 519, 4 L.Ed. 629, 645 (1819) (same). This Court has also defined it as a provision intended "to guarantee procedural standards adequate and appropriate, then and thereafter, to protect, at all times, people charged with, or suspected of, crime by those holding positions of favor and authority." *Lyons v. State,* 77 Okl.Cr. 197, 232, 138 P.2d 142 (1943), *aff'd,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), *overruled on other grounds, Hopper v. State,* 736 P.2d 538, 540 (Okl.Cr.1987). The law is "due process" when it operates on all alike during the regular course of its administration through the courts, and does not subject one to the arbitrary exercise of the powers of government. *Shaw v. State,* 76 Okl.Cr. 271, 134 P.2d 999 (1943) (syllabus); *see also Ward v. State,* 444 P.2d 255 (Okl.Cr.1968), *cert. denied,* 393 U.S. 1040, 89 S.Ct. 665, 21 L.Ed.2d 588 (1969) (Requirements of due process are met if a criminal trial is held according to a settled course of judicial proceedings).

Perhaps the best exposition on the characteristics of due process occurred in an 1878 New York case, where the writer said:

It is difficult to define with precision the exact meaning and scope of the phrase "due process of law." Any definition which could be given, would probably fail to comprehend all the cases to which it would apply. It is probably wiser, as recently stated by Mr. Justice Miller of the United States Supreme Court, to leave the meaning to be evolved "by the gradual process of judicial inclusion and exclusion, as the cases presented for decision shall require, with the reasoning on which such decisions may be founded." (*Davidson v. Board of Administrators of New Orleans,* 17 Albany Law Journal, 223) It may however be stated generally that due process of law requires an orderly proceeding adapted to the nature of the case in which the citizen

has an opportunity to be heard, and to defend, enforce, and protect his rights. A hearing or an opportunity to be heard, is absolutely essential. We cannot conceive of due process without this. In his argument in the *Dartmouth College case* (4 Wheat., 519, 4 L.Ed. 629), Webster defined "due process of law" as a proceeding "which proceeds upon inquiry and renders judgment only after trial." Mr. Justice Edwards in *Westervelt v. Gregg* (12 N.Y. 209) defines it as follows: "Due process of law undoubtedly means in due course of legal proceedings according to those rules and forms which have been established for the protection of private rights."....; and if found to be suitable or admissible in a special case it will be adjudged to be "due process of law;" but if found to be arbitrary, oppressive and unjust, it may be declared to be not due process of law. *Stuart v. Palmer,* 74 N.Y. 183, 191, 194 (1878); *See also Brown v. Board of Levee Com'rs,* 50 Miss. 468, 478–79 (1874) (whether written *"per legale judicium pariu, suorum, rel per legem terrae"* as found in the Magna Carta; "by the law of the land, or the judgment of his peers"; "due process of law"; "due course of law"; or "according to the law of the land," all have the same general interpretation); *Westervelt v. Gregg,* 12 N.Y. 202, 209 (1854).

However, the term also denotes more than simply the law of the land or the law as it was at the time the constitution took effect:

.... For that would seem to deny to the legislature the power to alter, change or amend the law. Yet we know that it is every day's practice for the law-making department of the government to repeal old laws, enact new, and change remedies.

The principle does not demand that the laws existing at any point of time shall be irrepealable, or that any forms of remedies shall necessarily continue.

It refers to certain fundamental rights which that system of justice, of which ours is a derivative, has always recognized. If any of these are disregarded, in the proceedings by which a person is condemned

to the loss of life, liberty or property, then the deprivation has not been by "due course of law."

*Brown,* 50 Miss. at 479.

One thing is clear: whatever Due Process is, it is not a wide-open, catch-all provision to be used by every defendant who loses a pretrial motion or by any appellate court that may not agree with the trial court results. As the Supreme Court has observed: "[b]eyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Medina,* 505 U.S. at ——, 112 S.Ct. at 2576, 120 L.Ed.2d at 362 (quoting *Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 674, 107 L.Ed.2d 708 (1990)). Indeed, as the *Medina* Court continued:

The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order. As we said in *Spencer v. Texas,* 385 U.S. 554, 564, 87 S.Ct. 648, 653, 17 L.Ed.2d 606 (1967), "it has never been thought that [decisions under the Due Process Clause] establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure." Accord, *Estelle v. McGuire,* 502 U.S. 62, ——, 112 S.Ct. 475, 481, 116 L.Ed.2d 385 (1991); *Marshall v. Lonberger,* 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983).

*Medina,* 505 U.S. at ——, 112 S.Ct. at 2576, 120 L.Ed.2d at 362.

■ From this, we can gather that, however due process is defined, it is satisfied if a defendant has notice[2] and an opportunity to be heard at a public proceeding at which all constitutional and statutory provisions are observed according to those rules and forms which have been established for the protection of private rights, in such a way that it

---

2. Appellant does not raise a lack of notice in connection with any of these proceedings; ac-

cordingly, we do not discuss this requirement of Due Process.

operates on all alike.[3] With those principles in mind, we now turn to the standard of proof a criminal defendant in Oklahoma must bear to prove his incompetence.

"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (quoting *In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). The *Addington* Court further observed the standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.

It seems clear the "preponderance-of-the-evidence" standard is generally used in civil proceedings, *e.g.*, matters involving monetary disputes, etc., because society has a minimal concern with the outcome of such private suits. It therefore makes sense that litigants "share the risk of error in roughly equal fashion." *Id.*

But in criminal cases, the interests of the defendant are of such magnitude that they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. In other words, "[i]n the administration of criminal justice, our society imposes almost the entire risk of error upon itself, by requiring the State to prove the guilt of an accused beyond a reasonable doubt." *Id.*, 441 U.S. at 423–24, 99 S.Ct. at 1807.

At issue here is the intermediate standard, which our Legislature has termed "clear and convincing." In using this standard our Legislature has determined the interests at stake in this area are more substantial than other civil proceedings (which a competency hearing has been determined to be, *see Miller v. State*, 751 P.2d 733, 737–38 (Okl.Cr.1988)).

The standard of proof used "is more than an empty semantic exercise." *Addington*, 441 U.S. at 425, 99 S.Ct. at 1809 (quoting

*Tippett v. Maryland*, 436 F.2d 1153, 1166 (4th Cir.1971) (Sobeloff, J., concurring in part and dissenting in part), *cert. dismissed sub nom. Murel v. Baltimore City Criminal Court*, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972)). By placing a certain standard on a certain party, it gives courts an indication of "the value society places on individual liberty." *Id.*

This Court, in considering what standard should govern in a present competency proceeding, must assess the presumption of competency together with the extent of the defendant's interest in not being tried while incompetent and the State's interest in being assured a defendant is not merely attempting to escape prosecution by feigning incompetence in a field where "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." *Medina*, 505 U.S. at ——, 112 S.Ct. at 2580, 120 L.Ed.2d at 367; *Addington*, 441 U.S. at 430, 99 S.Ct. at 1811–12.

Appellant's case is an excellent example of why our Legislature set the standard of proof so high. His attorneys first informed the trial court they were concerned about his competency because he refused to communicate with them, seeing them as evil forces seeking his death. However, even his own experts admitted the possibility Appellant was malingering. The State's expert, relying on inconsistent answers given to various health care personnel at Eastern State Hospital, Appellant's record, and observations of Appellant himself, concluded Appellant was competent. In the second hearing, held just before trial started, evidence indicated Appellant acted normally in other criminal proceedings and in situations which did not involve the murders. Even his own psychologist admitted one health care professional at Eastern State had labeled him a "world-class, first-class manipulator"; and was of the opinion Appellant both had an affective disorder and was malingering (although he was of the opinion it was the affective disor-

---

**3.** This discussion encompasses the criteria we use to determine whether Due Process was afforded this Appellant as it concerns the burden of proof utilized in his competency determination. We recognize the United States Supreme Court has addressed the concept of Due Process in a multitude of other areas. However, we need not review those areas, as they do not pertain to the case before us.

der, and not the malingering, which prevented Appellant from communicating with his attorneys).

We list these facts here not to determine at this juncture whether Appellant was in fact mentally ill, whether he was malingering, or both; but to illustrate the inexactness and uncertainty attached to proceedings of this nature, proceedings based on diagnoses which are "to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician." *Medina*, 505 U.S. at ——, 112 S.Ct. at 2580, 120 L.Ed.2d at 367 (quoting *Addington*, 441 U.S. at 430, 99 S.Ct. at 1811–12). The State has great interest in assuring its citizens a thorough and speedy judicial process, together with the presumption of competency which is historically based on our law. A truly incompetent criminal defendant, through his attorneys and experts, can prove incompetency with relative ease. Therefore, we find forcing a criminal defendant to prove by clear and convincing evidence he is incompetent is not subject to proscription under the Due Process Clause, because it does not "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina*, 505 U.S. at ——, 112 S.Ct. at 2577, 120 L.Ed.2d at 363 (quoting *Patterson*, 432 U.S. at 202, 97 S.Ct. at 2322–23).

We therefore reject Appellant's first proposition of error.

## B.

We now turn to Appellant's third proposition, whether Appellant presented sufficient evidence to show he was incompetent.

Appellant had two competency hearings: one in late December 1990 and early January 1991; and the second at the start of his trial, May 1992. Appellant now complains both rulings were incorrect.

■ This Court has held there are two questions which must be addressed in determining present competency. First, we look at whether the defendant was able to understand the nature of the charges and proceedings brought against him; and second, whether the defendant had the ability effectively and rationally to assist in his defense.

*Smith v. State*, 819 P.2d 270, 273–74 (Okl.Cr. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2312, 119 L.Ed.2d 232 (1992). As we discussed above, a defendant is presumed competent, and must prove otherwise by clear and convincing evidence. 22 O.S.Supp.1985, § 1175.4.

■ The first hearing presents no real problem. At that hearing, Dr. Edith King testified Appellant was clearly incompetent before he was sent to Vinita. She gave as examples Appellant seemed very vague concerning his charge and became agitated when asked about the murder charge; he had difficulty focusing on any subject for very long; he did not appear to know what would happen to him if he were convicted, saying he would probably get to go home. Dr. King opined Appellant displayed a thought disorder, with possible auditory and visual hallucinations. However, she thought he could be treated. She admitted the possibility Appellant was malingering, and testified that he seemed more in touch with reality the day of the hearing. However, she could not say he was competent the day of the hearing. On the other hand, Dr. Jeanne Russell testified she conducted the screening interview with Appellant when he entered Eastern State Hospital. At that time, he denied knowing the charges against him, his birthdate, or what his attorney's role was. She also reviewed his hospital record, talked with the staff, and contacted the Department of Corrections concerning previous mental history. She also observed him herself. She did not think Appellant's answers were consistent with answers given other staff members, who recorded some of his statements in his record. In those records, there were at least four occasions recorded where he expressed an understanding of courtroom procedure, knew what the charges against him were, and was aware of the consequences of a conviction. The records also showed Appellant expressed an interest in a plea of not guilty by reason of insanity, indicating he had some knowledge of a possible defense. On one occasion, Appellant was reported to have said: "[y]ou're wasting your time going over courtroom proceedings with me. I know them. I've already spent 10 calendar years behind bars." On another occasion, a

notation stated Appellant "won't discuss charges with staff. No reservations in talking with peers," and reportedly said "I've got nothing to lose, I've already got two murder raps on me."[4]

Based on this evidence, we do not find error in the trial court's ruling Appellant was competent.

■ At the second post-examination competency hearing,[5] Appellant's evidence was stronger. Defense counsel presented inmates from Appellant's jail pod who testified as to Appellant's strange behavior: he compulsively and continually cleaned his cell; played with his feces, smearing it on his face; and talked to himself or to thin air. Dr. Philip Murphy agreed with the comment of a nurse at Eastern State who labeled Appellant a "world-class, first-class manipulator"; however, the psychologist also testified Appellant suffered from major affective (i.e., mood) disorder, which was a form of mental illness. The disorder was episodic in form, meaning it would wax and wane on its own, which made treatment difficult; however, it was treatable. And although Appellant was a malingerer, it was the mental illness which kept him from communicating with his counsel. Therefore, Appellant was not competent.

The prosecution's evidence consisted of various jailers who had worked in the jail pod in which Appellant was housed. None of them had noticed anything strange about Appellant, such as compulsive cleaning of his cell, smearing feces on his face or talking while no one else was there. They testified Appellant communicates normally with other inmates and seemed to be aware of his surroundings. The prosecution also presented evidence Appellant had filed two *pro se* civil rights complaints in federal court, one in October 1991 and one in January 1992. When responses were served on him in jail, he appeared to read the responses and understand their contents.

■ The court was not required to give controlling effect to the opinion of the expert, and instead found in accord with the State's lay witnesses. This is permissible. *Moore v. State*, 672 P.2d 1175, 1177 (Okl.Cr.1983). As we said in *Siah v. State*, 837 P.2d 485, 487 (Okl.Cr.1992), "this Court has never imposed a static analysis for the lower court to apply in all post-examination competency hearings, and we decline to do so now." Examining the entire record of the proceedings before us, *Fox v. State*, 524 P.2d 60, 65 (Okl.Cr.1974) we hold the trial judge did not abuse his discretion in finding Appellant had not met his burden of proving incompetency.

This proposition is without merit.[6]

4. Appellant argues on appeal Dr. Russell was not a credible witness, as she was not on Appellant's psychiatric team at Eastern State and had never had any significant personal contact with him. We find this unpersuasive. *See Johnson v. State*, 761 P.2d 484, 492 (Okl.Cr.1988) (psychiatrists who were responsible for evaluating Appellant almost five years earlier were dead at time case remanded for post-evaluation competency hearing; however, medical records were still intact and a doctor on staff at Eastern State Hospital testified regarding the information in appellant's record. Court did not question ability of later doctor to make analysis based on records alone.)

5. At trial, Appellant's attorneys argued to the court the hearing held right before trial was not the post-examination competency hearing, but rather the first hearing, at which the court must have a "doubt" as to a defendant's competency before he can order an evaluation. *See* sections 1175.2 and 1175.3 of Title 22. Trial attorneys also argued that because the hearing was the pre-evaluation hearing, the trial court used the wrong standard in determining there was no merit to Appellant's claim. However, on appeal, Appellant seems to have abandoned that argument, instead referring to both the earlier hearing and the hearing immediately before jury selection as "post-examination competency hearings." Appellant's brief-in-chief at 13; *see also* brief at 15. We therefore need not address the question presented at the trial level concerning which hearing was actually held before trial.

6. We feel compelled to address an extremely lamentable comment by the trial judge, if only to show no error occurred other than a slip of the tongue. At the same hearing during which defense counsel expressed his opinion Appellant was faking incompetency (but was not positive that was the case), the court agreed the issue could rise again. In response to counsel's cautionary observation Appellant may not be faking and could damage his chances if he acted up in front of the jury, the court stated: "It's a travesty, perhaps. We're talking about two things. Insanity as a defense to a crime or incompetence to assist counsel. So, if an incompetent person is convicted of a crime that he committed when he was sane, I don't see any harm's done." However, this Court does not look at the record in isolation. During the second competency hearing, the trial court exhibited an overabundance of caution in protecting Appellant's rights.

## C.

■ For his fourth proposition, Appellant alleges the court erred in accepting trial counsel's waiver of his right to have a jury determine competency. On both occasions, the court specifically asked defense counsel if they wanted a jury trial on the issue of competency; on each occasion, they expressly waived it. Defendant acknowledges that; however, he complains they did not consult him before waiving the right, as he claims they must do.

The applicable statute reads in pertinent part:

B. The court, at the hearing on the application, shall determine, by clear and convincing evidence, if the person is incompetent. .... If the court deems it necessary, or if the person alleged to be a person requiring treatment, or any relative, friend, or any person with whom he may reside, or at whose house he may be, *shall so demand,* the court shall schedule the hearing on the application as a jury trial to be held within seventy-two (72) hours of the request,....

22 O.S.Supp.1985, § 1175.4 (emphasis added). This Court has interpreted that provision to mean a defendant is entitled to a jury trial on the issue of competency only if he demands it. *Scott v. State,* 730 P.2d 7 (Okl.Cr.1986).

Appellant's cases are inapplicable. *Beck v. State,* 626 P.2d 327, 328 (Okl.Cr.1981), concerns itself with section 1162 of Title 22, dealing with sanity, not competency. *Hayes v. State,* 541 P.2d 210, 212 (Okl.Cr.1975) deals with a valid waiver of trial by jury.

Here, Appellant was not speaking to his attorneys. Under the circumstances, they did the best they could, calculating the bench would be kinder to them than a jury would. This proposition is without merit.

## III. JURY SELECTION ISSUES

### A.

■ Appellant in his seventh proposition of error complains the prosecutor defined "reasonable doubt" for the jury during voir

dire. The record shows during voir dire, the prosecutor asked one prospective juror: "And you can't define it, like we've said, but without telling me what it is, do you think you can come to a conclusion about what that means, what reasonable doubt is, what's reasonable, what's a doubt, all that?"

We find no error, as we find this question did not attempt to define reasonable doubt. *Cf. Diaz v. State,* 728 P.2d 503, 511 (Okl.Cr. 1986) (Comment by prosecutor "You have heard all this talk about beyond a reasonable doubt and you heard the Court ... saying that that is not the same thing as beyond a shadow of a doubt." Did not constitute the prosecutor's "defining" the phrase, nor did the remark create an erroneous impression.); *Wald v. State,* 513 P.2d 330, 333 (Okl.Cr. 1973) (Question by prosecutor "... does the term 'reasonable doubt' to you in your mind connote to you beyond all doubt whatsoever? In other words the law implies or gives the State of Oklahoma the burden of proving a person charged with a crime the burden of proving that person guilty beyond a reasonable doubt, but I'm sure all of you have heard the term beyond a shadow of a doubt or beyond all doubt, and what I am asking you, would you hold the State of Oklahoma to a greater degree of proof than the law imposes?" Held, no attempt made by the prosecutor to define the term of reasonable doubt).

Accordingly, this assignment of error is without merit.

### B.

In his eighth proposition of error, Appellant contends the trial court improperly excused for cause two panel members based on their answers to questions about the death penalty.

■ The first juror to which Appellant objects is Florence Fields. She first said she could consider the death penalty in a proper case. She related she had a cousin whose body was found three days after she was abducted and murdered; she had another relative to whom she was not very close who

*See* 5–4 Tr. 31–38, 260–272; I Trial Tr. 3–8. In other words, although the court may have made

an injudicious comment, his judicious actions belied his words.

had been stabbed to death by a boyfriend. The abduction and murder occurred approximately five or six months before this trial; the stabbing occurred three or four years before. During questioning by the prosecutor, Ms. Fields then said she did not believe in the death penalty "under no circumstances." Consequently, when asked if she could sentence someone to death, she said she could "not really" do that. At that point, the court stepped back in, reminded her she had said she could do so. When asked to explain her answers, she said "Well, if you consider it all the way around, then I wouldn't. I could consider it, but just to say I would put somebody to death, no." The court, in an attempt to interpret her answer, asked "[y]ou could consider it, but you couldn't put them to death. Is that what you're saying?" to which Ms. Fields responded "yes." Then in response to questioning by defense counsel, she said there were no circumstances where she could give the death penalty. She then said there might be circumstances where the death penalty was deserved, but "I don't know if I could really do that." She said she would keep an open mind. However, when again asked by the prosecutor, she said she would not ever give the death penalty. At that point, the court excused her for cause.

The Supreme Court in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), dispensed with earlier language in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) by holding a party need not prove a juror's bias against the death penalty with "unmistakable clarity," observing this was because "determination of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Wainwright,* 469 U.S. at 424, 105 S.Ct. at 852.

What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react

when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror.

*Id.,* 469 U.S. at 424–26, 852–53. We have followed that philosophy. *See, e.g., Robedeaux v. State,* 866 P.2d 417, 424 (Okl.Cr. 1993); *Banks v. State,* 701 P.2d 418, 421–422 (Okl.Cr.1985), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992).

The same thing is true concerning Verna Kolar. She told the court the district attorney's office had prosecuted her brother in a case a few years before; however, she also said her brother admitted the accusations and pled guilty, so she held no grudges. She first said she could base the punishment on the crime and surrounding facts.[7] She then said she could "probably" agree on a verdict imposing death, "but I do not know if I could sleep well that night doing so." The court then observed:

Well, it's very difficult sometimes for people to sleep for anything, you know. This is one of those times you just have to do what you think is right. You say you probably could. Now we're talking about where the law and the evidence warrant, could you agree on a verdict imposing the death penalty. I'm not trying to make you say one or the other; I'm just asking what you think?

PROSPECTIVE JUROR KOLAR: No, no I could not.

THE COURT: If you found beyond a reasonable doubt that the Defendant was guilty of Murder in the First Degree, and if, understand the evidence, the facts and circumstances of the case, the law would permit you to consider a sentence of death,

7. When asked if she had any feelings that would prevent or impair her from considering the death penalty, she replied: "I want to say, yes, I do and, no, I don't. There have been instances when I could answer that easily and say, yes, that person is guilty, that person deserves to die. And there have been other instances when I could not say that."

are your reservations about the death penalty such that, regardless of law, the fact and circumstances of the case, you would not inflict the death penalty?

PROSPECTIVE JUROR KOLAR: No sir, I would not.

During questioning by defense counsel, Ms. Kolar said she had said in the past one person or another deserved to die, but "that's because I was out there and I could say those things, because I had no effect whatsoever on that person's life. and here, I do. I cannot easily say that about another human being." On further questioning, Ms. Kolar admitted she could "sit here and say I can [impose the death penalty under the proper circumstances], but there's a lot of difference in sitting right here, even, and walking out that door and doing it. I have no idea what I will do there." The court gave Ms. Kolar the night to consider her position, then excused her the next morning without further questioning. Defense counsel did not object.

The same analysis applies to Ms. Kolar as to Ms. Fields. *Wainwright, supra; Robedeaux, supra, Banks, supra.*

This proposition is without merit.

### C.

■ Appellant then complains his constitutional rights were violated by the use of "death qualification" voir dire questions.

8. It appears the instruction was based on the evidence Appellant ran when first confronted by police, rather than on evidence Appellant left the scene of the murder, although the record could have been clearer ·on this point. Appellant's counsel admitted as much during oral argument, pointing out the only reference by the prosecutor to flight during his closing argument was in connection with Appellant's attempts to run from police when spotted several days after the murder.

9. That section, in effect and unchanged since our laws were adopted from the Dakota Laws of 1887, reads: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to be acquitted." In supplemental authority, Appellant has provided us with United States Supreme court cases containing dicta which indicate the presumption of innocence is "axiomatic and elementary." *See e.g., In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d

We have repeatedly considered this argument, and have repeatedly rejected it. *Boltz v. State*, 806 P.2d 1117, 1123 (Okl.Cr.1991), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *Moore v. State*, 761 P.2d 866, 877 (Okl.Cr.1988); *Johns v. State*, 742 P.2d 1142, 1148 (Okl.Cr.1987); *Banks v. State*, 728 P.2d 497, 502 (Okl.Cr.1986); *Hager v. State*, 665 P.2d 319, 322 (Okl.Cr.1983). We do so yet once again. Appellant's ninth proposition of error is without merit.

### IV. FIRST-STAGE TRIAL ISSUES

### A.

■ For his fifth proposition, Appellant claims his case must be reversed because the court gave the jury the standard flight instruction, OUJI–CR 806.[8] Appellant did not testify at trial, nor did he offer any explanation for his conduct.

Appellant points out this Court in *Mitchell v. State*, 876 P.2d 682 (Okl.Cr.1994), declared improper a court's giving the flight instruction in cases where the defendant did not explain his departure. The Court reasoned that giving the instructions in a situation such as this one violated a defendant's presumption of innocence, *see* 22 O.S.1981, § 836,[9] as it "assum[ed] the defendant [has] committed the crime." *Mitchell*, 876 P.2d at 684.

368 (1970). We recognize the possibility the presumption of innocence may be so ingrained in our system of justice as to assume Fourteenth Amendment Due Process proportions. However, the law upon which our statutory presumption of innocence is based predates even *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481, 491 (1895), the basis for all subsequent Supreme Court pronouncements on the subject. Indeed, it is this statutory presumption, and not any ephemeral Due Process concerns, which provided the basis for *Vuletich v. State*, 735 P.2d 568 (Okl.Cr.1987), quoted by *Mitchell* as authority for the infirmity in language from OUJI–CR 806. It was in *Vuletich* where we said: "[i]t is improper to tell a jury they must determine guilt or innocence. It is the jury's duty to determine whether the State has demonstrated guilt beyond a reasonable doubt..... If the State fails to sustain its burden, the jury must find the defendant not guilty. See 22 O.S.1981, § 836. A determination of innocence is not required." *Id.* at 569.

The State acknowledges *Mitchell,* but argues it should be applied prospectively only, since it constituted a "clear break from prior law." State's brief at 25.[10] Appellant in his reply brief cited *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), which held that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past. We must therefore determine whether *Griffith* is applicable in this case. We hold it is not.

*Griffith* and the retroactivity principle is indeed applicable in all questions concerning federal questions. However, the Supreme Court has never held we must apply the same standard to holdings by this Court dealing with issues of state law. To the contrary, the Court has explicitly stated that when questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions. *See Harper v. Virginia Dept. of Taxation,* 509 U.S. ——, ——, 113 S.Ct. 2510, 2519, 125 L.Ed.2d 74, 88 (1993); *American Trucking Associations, Inc. v. Smith,* 496 U.S. 167, 178, 110 S.Ct. 2323, 2330–31, 110 L.Ed.2d 148 (1990); *Great Northern R. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932); *see also Lackey v. Scott,* 28 F.3d 486, 491 (5th Cir.1994) (Texas Court of Criminal Appeals decision requiring definition of reasonable doubt not governed by *Griffith,* as "Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so"; citing to *American Trucking* ); *McSherry v. Block,* 880 F.2d 1049, 1052–53 & n. 2 (9th Cir.1989), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991); *Diggs v. Owens,* 833 F.2d 439, 442 (3d Cir.1987) (holding *Griffith* applied to constitutional rules of

criminal procedure; does not require retroactive application of "new procedural decisions not constitutionally grounded"); *Royster v. Fauver,* 775 F.2d 527, 529 (3d Cir. 1985); *Galloway v. Beto,* 421 F.2d 284, 289 (5th Cir.1970), *cert. denied,* 400 U.S. 912, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970) (court not bound by Texas court's pronouncement on double jeopardy, but is bound by Texas court's holding on the relationship of two offenses as it affects an implied acquittal doctrine).

This Court has heretofore made pronouncements which it declared would be applied prospectively only. *See e.g., Perez v. State,* 798 P.2d 639, 640 (Okl.Cr.1990); *State v. Neal,* 604 P.2d 145, 147 (Okl.Cr.1979); *Walton v. State,* 565 P.2d 716, 718 (Okl.Cr. 1977). Appellant, however, responds those rulings were based on federal caselaw which was overruled by *Griffith.*

We recognize this, but find it has no bearing on our analysis. A state court is empowered to use federal law in analyzing questions of state law. We are free to use these federal cases as persuasive authority for the purpose of guidance; however they do not themselves compel the result we have reached. *Michigan v. Long,* 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983). We have done so before, and do so here. *See also Rivers v. State,* 889 P.2d 288, 291 (Okl.Cr.1994).

The basic principles of retroactivity in criminal cases before *Griffith* were established in *Linkletter v. Walker,* 381 U.S. 618, 636, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965); *Tehan v. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), and *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). In summing up those

---

**10.** At oral argument, the State proposed *Mitchell* should be applied to all cases after Appellant's Mitchell himself. We find no authority for that. In cases such as *Fite v. State,* 873 P.2d 293 (Okl.Cr.1993), we declined to apply our ruling to the appellant before us, as to do so would create an "ex post facto"/Due Process violation arising from the new ruling itself. In other situations, the ruling announced also applied to the appellant in that particular case, if it was not a profound break from prior caselaw. *See e.g., People*

*v. Ward,* 206 Mich.App. 38, 520 N.W.2d 363, 366 (1994) (case holding defendant waives complaint of disproportionate sentence by pleading guilty pursuant to a plea bargain applied retroactively to case *sub judice;* result was clearly foreshadowed by other cases). We find no cases—and the State provides none—in which the appellate court made a pronouncement in an appellant's favor, but did not apply that favorable ruling to the appellant before them, who advanced the argument.

cases, the Court in *Stovall v. Denno,* 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), said:

> "[t]he criteria guiding resolution of the [retroactivity] question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."

*Stovall,* 388 U.S. at 297, 87 S.Ct. at 1970. *See also Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). This is the standard this Court has used previously. *See Edwards v. State,* 591 P.2d 313, 317 (Okl.Cr.1979); *Rutledge v. State,* 527 P.2d 1373, 1375 (Okl.Cr.1974); *Poke v. State,* 515 P.2d 252, 254 (Okl.Cr.1973); *Garrett v. State,* 438 P.2d 945, 948 (Okl.Cr.1968) (ruling correcting deficient instruction to be applied

prospectively only). We find these criteria still valid in interpreting our state law questions. *See Griffith,* 479 U.S. at 329–34, 107 S.Ct. at 716–19 (White, J., with whom Rehnquist, C.J. and O'Connor, J., join, dissenting).[11]

Having established the criteria this Court uses to determine whether a holding of state law should be retroactive, we now turn to the case *sub judice.*

Concerning (b) the extent of the reliance by law enforcement authorities on the old standards, there can be little debate OUJI–CR 806 "would have been given in the proper situation by every court in this jurisdiction based on caselaw that existed before *Mitchell.*" *Rivers,* 889 P.2d at 292. The *Mitchell* Court itself noted use of the instruction had caused "confusion" in the past. *Id.,* 876 P.2d at 685. And this Court has approved of its

11. We are not the only state to hold in this fashion. *See People v. Carrera,* 49 Cal.3d 291, 261 Cal.Rptr. 348, 369–71, 777 P.2d 121, 142–43 (1989); *People v. Robinson,* 229 Cal.App.3d 1620, 281 Cal.Rptr. 26, 29 (1991) (defendant convicted, then escaped. In interim, appellate court hands down ruling which would have been favorable to appellant had his appeal been decided earlier. Court refuses to apply retroactively, as to do so would be "inherently offensive to the judicial process."); *Fenelon v. State,* 594 So.2d 292, 295 (Fla.1992) (case banning flight instruction given prospective application only; harmless error analysis conducted); *Green v. State,* 641 So.2d 391, 395 (Fla.1994) (stressing prospectivity); *Taylor v. State,* 630 So.2d 1038, 1042 (Fla.1993), *cert. denied,* — U.S. —, 115 S.Ct. 107, 130 L.Ed.2d 54 (1994) (same); *Gray v. State,* 640 So.2d 186, 193–94 (Fla.App.1994) (notes state supreme court moved away from prior caselaw, which would have held *Fenelon* applied retrospectively; cases cited); *Gilliam v. State,* 582 So.2d 610, 612 (Fla.1991) (caselaw requiring sentencing judge in capital case to expressly evaluate in written order each mitigating circumstance to determine whether it is supported by evidence applied prospectively only; prior holdings not fundamental changes, but rather "evolutionary refinements"); *State v. Singletary,* 549 So.2d 996, 999 (Fla.1989) (decision requiring judge to be present during voir dire questioning by attorneys to be applied prospectively only) *Catlett v. State,* 627 So.2d 558, 559 (Fla.App. 1993) (recognizing prospective application of *Singletary; People v. Steidl,* 142 Ill.2d 204, 154 Ill.Dec. 616, 633, 568 N.E.2d 837, 854 (1991), *cert. denied,* 502 U.S. 853, 112 S.Ct. 161, 116 L.Ed.2d 125 (1991) (holding in *People v. Gacho,* 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146 (1988), *cert. denied,* 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988) requiring new instruc-

tion in multiple murders involving mitigating evidence in capital cases was prospective only; *Griffith* not applicable); *Foster v. State,* 639 So.2d 1263, 1298–99 (Miss.1994) (noting prospective application of decision prohibiting use of two specific aggravating circumstances in capital case under common fact pattern); *People v. Sprowal,* 84 N.Y.2d 113, 615 N.Y.S.2d 328, 331–32, 638 N.Ed.2d 973, 976–77 (1994) (decisions requiring defendant to be present during sidebar conferences between judge and prospective juror to be applied prospectively only, even though absence in some instances could have a "substantial effect" on the ability to defend against the charges); *People v. Garcia,* 161 Misc.2d 1, 612 N.Y.S.2d 552, 555–56 (N.Y.A.D.1994) (recognizing *Griffith,* but using *Linkletter* factors to determine retroactivity of state issue); *Geesa v. State,* 820 S.W.2d 154, 163–65 (Tex.Crim.App. 1991) (holding dealing with definition of reasonable doubt prospective only, as it does not change the standard of proof of reasonable doubt; *Griffith* not applicable); *Barnes v. State,* 876 S.W.2d 316, 328 (Tex.Crim.App.1994), *cert. denied,* — U.S. —, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994) (following *Geesa*); *Labrum v. Utah State Board of Pardons,* 870 P.2d 902, 912 n. 9 (Utah 1993); *Hurn v. State,* 872 P.2d 189, 198–99 (Alaska App.1994) (decision placing duty on trial judge to make record of a defendant's decision not to testify to be applied prospectively; using factors enunciated in *Linkletter* and *Stovall*); *State v. Adams,* 156 Ariz. 88, 750 P.2d 31, 32 (Ariz.Ct.App.1987); *State v. Ottwell,* 852 S.W.2d 370, 372 (Mo.Ct.App.1993) (State supreme court decision holding instruction on intoxication violated Due Process to be applied prospectively, except in cases where complaint was preserved at trial by appropriate objection).

use in prior cases similar to Appellant's, regardless of whether an explanation was given. *See Id.*, 876 P.2d at 686–87 (Lumpkin, P.J., which whom Lane, J., joins, dissenting), and cases cited therein.

Concerning (c) the effect on the administration of justice of a retroactive application of the new standards and (a) the purpose to be served by the new standards, requiring only a prospective application places Appellant "in the same situation as those on post-conviction, eliminating the inherent inequality that results between appellants whose appeals are separated only by time." *Rivers*, 889 P.2d at 292. It also eliminates the inherent unfairness which a clear break with prior existing caselaw can place on the court below, who gave the instruction in good faith. *Id.*

We therefore hold *Mitchell* does not automatically apply retroactively, *see Rivers*, 889 P.2d at 292, and it does not apply in this case.

■ There is another, equally compelling, reason *Mitchell* does not apply here. This Court in *Mitchell* made it clear whether reversible error occurred would be determined by the particular facts of each case. *See Id.*, 876 P.2d at 685 ("*Based on the facts in this case*, it was reversible error to give instructions on flight" (emphasis added)). This fact-specific dictate is also reflected in *Kentucky v. Whorton*, 441 U.S. 786, 788–89, 99 S.Ct. 2088, 2089–90, 60 L.Ed.2d 640 (1979). There, a state district court failed to give an instruction on the presumption of innocence. The Kentucky Supreme Court reversed, feeling such an instruction was mandated by *Taylor v. Kentucky*, 436 U.S. 478, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). The United States Supreme Court disagreed, stating the failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution. Rather, "such a failure must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors—to determine whether the defendant received a constitutionally fair trial." *Whor-*

*ton*, 441 U.S. at 789, 99 S.Ct. at 2090. *See also Hyatt v. State*, 779 P.2d 993, 995 (Okl. Cr.1989) (following *Whorton*).

The facts of this case do not require reversal. As noted above, it seems clear the flight instruction was given here not based on Appellant's flight from the *crime*, but from his flight from *police* several days after the crime. The evidence showed when Appellant was apprehended after the chase, he was carrying a device commonly used to smoke crack cocaine. He was arrested for possession of drug paraphernalia based on this charge.

Therefore, *Mitchell* is not applicable here, as it does not "assume the defendant to have committed the crime" for which he was on trial. *Mitchell*, 876 P.2d at 684. If anything, the instruction was improperly given, not because of flight to avoid arrest on a murder charge, but because it would tend to show he committed the crime of possession of drug paraphernalia, a crime with which he was not charged. *See Compton v. State*, 74 Okl.Cr. 48, 53, 122 P.2d 819, 821 (1942) (flight signifies not merely leaving, but leaving under a consciousness of guilt and for the purpose of evading arrest). Accordingly, we find any error in giving the flight instruction was harmless, as the misdirection of the jury has not "resulted in a miscarriage of justice," or has not constituted "a substantial violation of a constitutional or statutory right." 20 O.S. 1991, § 3001.1.

Consequently, we find Appellant's fifth proposition to be without merit.

**B.**

■ At trial, Appellant's attorneys submitted the following handwritten instruction defining reasonable doubt.

"You are instructed that the term proof beyond a reasonable doubt means evidence which creates a moral certainty as to the guilt of the defendant. If the evidence does not amount to a moral certainty in your mind you must find the defendant not guilty."

The instruction was refused. For his sixth proposition, Appellant claims the court erred in refusing the instruction.

We disagree. This Court has a long history of holding it is error to give an instruction defining reasonable doubt, whether it is requested by the defendant, *see Grant v. State,* 703 P.2d 943, 946 (Okl.Cr.1985), *Spitznas v. State,* 666 P.2d 1307, 1307–08 (Okl.Cr.1983), *Templer v. State,* 494 P.2d 667, 671–72 (Okl. Cr.1972) *Mott v. State,* 94 Okla.Crim. 145, 156, 232 P.2d 166, 177 (1951); or given by the court, *see Fellows v: State,* 508 P.2d 1089, 1090–91 (Okl.Cr.1973), *Young v. State,* 373 P.2d 273, 277–79 (Okl.Cr.1962), *cert. denied,* 371 U.S. 957, 83 S.Ct. 513, 9 L.Ed.2d 504 (1963); *Brookshire v. State,* 284 P.2d 752, 754–55 (Okl.Cr.1955), *Lippoldt v. State,* 271 P.2d 745, 749 (Okl.Cr.1954), *Wallace v. State,* 96 Okl.Cr. 163, 164–65, 250 P.2d 484, 485–86 (1952). This is so because to give such an instruction tends to confuse the jury.

Specifically, we have addressed the "moral certainty" language requested by appellant's trial counsel. In doing so, we stated:

> Fourthly, the defendant complains of error in trial court by a refusal to allow the defense counsel to use the term 'moral certainty' as synonymous with 'beyond a reasonable doubt'. . . .
>
> The defendant goes on . . . to urge that the court committed error in refusing to allow the defendant an instruction on the terms 'moral certainty' and 'beyond a reasonable doubt.' Defendant cites as his only authority . . . the case of *Gray v. State,* 56 Okl.Cr. 208, 38 P.2d 967 (1934), wherein the Court held that while the terms 'moral certainty' and 'beyond a reasonable doubt' are synonymous in some dictionaries, the difficulty is that the words 'moral certainty' add nothing to the words 'beyond a reasonable doubt,' as one may require explanation as much as the other. We also observe that *Gray,* supra, as well as a number of more recent cases, holds that it is not necessary for the trial court to define what is meant by a 'reasonable doubt,' and trial courts have been repeatedly admonished against giving any instruction attempting to define the term 'reasonable doubt.'

In more recent years, trial courts have been severely criticized by this Court for attempting to define the term 'reasonable doubt.' See *Bell v. State,* Okl.Cr., 381 P.2d 167 (1963); and, it has even been held reversible error to so define this difficulty-of-definition term. *Wilson v. State,* Okl. Cr., 403 P.2d 262 (1965); *Lee v. State,* Okl.Cr., 430 P.2d 858 (1967).

We reiterate the phrase 'reasonable doubt' is self-explanatory, and definitions thereof do not clarify its meaning, but rather tend to confuse a jury; therefore, instructions defining it are unnecessary, and should not be given. The same logic should apply in attempts in voir dire examinations to explain to the jury what is meant by 'reasonable doubt.'

*Templer,* 494 P.2d at 671–72. *See also Victor v. Nebraska,* 511 U.S. ——, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

Accordingly, Appellant's sixth proposition is without merit.

### C.

▬ In his tenth proposition, Appellant alleges the court erred in allowing into evidence a color photograph of Mr. Sheppard taken at the scene. The photograph showed the position of the body after it had been rolled off its side. It displayed characteristics of a body which had been left unattended for four days. During the second stage, the prosecution introduced photographs of Mrs. Warner as she was found half-nude in her residence. Other photographs depicted the injury caused by the ramming of the knife-sharpening tool into her neck.

We have carefully reviewed the photographs and do not find them unduly gruesome. As we recently said in *McCormick v. State,* 845 P.2d 896, 898 (Okl.Cr.1993), "[g]ruesome crimes result in gruesome photographs." We find no abuse of the trial court's discretion in admitting the photographs. Accordingly, this proposition is without merit.

### V. COMPETENCY OF COUNSEL

Appellant next argues his counsel was incompetent. He bases this allegation on two

grounds. The first is his attorney's sharing his beliefs with the court Appellant was "faking" incompetence. The second portion relates to his incompetence to stand trial; he essentially argues his counsel was incompetent in his representation because Appellant himself was incompetent, and therefore could not communicate with counsel.

■ The second portion of Appellant's argument hinges on the trial court's determination he was competent. If Appellant was competent and merely malingering, any lack of communication with counsel was solely Appellant's fault; if Appellant were incompetent, this case would be reversed on that basis. Therefore, we will reserve the second portion of Appellant's argument until we reach the threshold matter of Appellant's competency.

■ Concerning the first portion of the proposition, the record shows counsel filed an application for determination of competency in August 1990. At that time, Appellant was examined by a psychologist who recommended he be sent to Eastern State Hospital at Vinita for examination, which the District Court ordered. Upon completion of his treatment, Appellant was returned to Oklahoma County, where his counsel waived determination by jury. A post-examination competency hearing presented to the bench was held, and at the conclusion of the hearing Appellant was adjudged competent. During that hearing, defense counsel presented the same psychologist who had examined Appellant before he went to Vinita. He claims on appeal counsel was ineffective for failing to get a new psychologist, someone who could base impressions on an interview with Appellant after his return from Vinita instead of relying almost exclusively on data obtained before he left.

We first address the claim counsel was somehow incompetent because he was candid with the court in sharing his belief Appellant was "faking" competency. This did not occur during either the first competency hearing or even during the second one; rather, counsel made his comment at the end of another hearing discussing other motions which occurred after the first competency hearing. Counsel felt the need to make a record on his client's uncooperative and threatening attitude. Counsel also quickly followed up his personal belief with the statement he was not a doctor, and others in his office felt Appellant was incompetent; therefore, he felt obliged to raise the issue again. After the court reminded counsel of the results of the first competency hearing, counsel observed incompetency could happen at any time, then essentially let the matter drop at that time.

However, immediately before the start of jury selection proceedings, the same counsel recanted his earlier statements, telling the court his client was incompetent and requested another hearing.

In short, counsel had not made his statements at the first hearing. After the first hearing and before the second one, counsel as an officer of the court candidly expressed his impressions, as he had a duty to do. *Model Rules of Professional Conduct* Rule 3.3(a)(2),[12] 5 O.S.Supp.1988, Ch. 1, App. 3–A. By the time of trial and the second hearing, counsel recanted his statements. Appellant has cited us no authority—and we know of none—declaring an attorney incompetent as a matter of constitutional law because that attorney may harbor doubts as to his client's sincerity in a criminal proceeding.

■ Concerning counsel's failure to obtain another expert for the post-examination competency hearing, we find no error. Evaluating the entire record of competency proceedings before us, *Fox v. State*, 524 P.2d 60, 65 (Okl.Cr.1974),[13] selection of another expert

---

12. That rule reads:
(a) a lawyer shall not knowingly:
. . . .
(2) fail to disclose a fact to a tribunal when disclosure is necessary to avoid a criminal or fraudulent act by the client.

13. There, we said:
It is not sufficient for the defense counsel merely to say that he is unable to communicate with his client; and, that his client's mental processes seem to waver while he is discussing the case with him; and, that his client does not understand the seriousness of a charge, to constitute justification for a finding that the defendant is mentally incompetent. In considering this question it is necessary that we consider the entire record.

would not have changed the outcome of the proceedings. The record was virtually brimming with evidence Appellant was malingering (that evidence is discussed in II.B., above).

Absent evidence to the contrary, and examining counsel's performance during both hearings, we cannot declare that Appellant has rebutted the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Camron v. State*, 829 P.2d 47, 56 (Okl.Cr.1992) (citing *Strickland v. Washington*, 466 U.S. 668, 694–96, 104 S.Ct. 2052, 2068–69, 80 L.Ed.2d 674 (1984); or that but for his conduct, there was a reasonable probability the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* 829 P.2d at 56; *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070.

In light of the discussion contained in Appellant's third proposition, it follows Appellant's counsel was not incompetent because he could not communicate with Appellant either in preparing for or during trial. As we have previously observed, "[a]lthough appellant was a difficult client to represent, he was not an incompetent one." *Johnson v. State*, 761 P.2d 484, 492 (Okl.Cr.1988). The decision not to communicate with counsel was Appellant's alone; whatever reasons he may have had for not communicating, it was not because he was unable to do so.

## VI. SECOND–STAGE TRIAL ISSUES

### A.

■ Appellant next contends the court committed error by failing to instruct the jury it had the option to return a life sentence regardless of its findings of aggravating circumstances.

We have rejected this argument previously. *Williamson v. State*, 812 P.2d 384, 410 (Okl.Cr.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). We do so again.

This eleventh proposition is without merit.

### B.

■ Appellant next contends the court erred in failing to instruct the jury it could consider sympathy for the accused in assessing punishment.

We have addressed this issue before and have continually found it to be lacking. *Stout v. State*, 817 P.2d 737, 740 (1991). We do so again.

This twelfth proposition of error is without merit.

### C.

■ Appellant in his thirteenth proposition of error contends the court erred in not instructing the jury its findings concerning mitigating circumstances did not have to be unanimous.

This, too, has been considered and rejected by this Court. *Mayes v. State*, 887 P.2d 1288, (Okl.Cr.1994).

Accordingly, this proposition of error is without merit.

### D.

■ For his fourteenth proposition of error, Appellant asserts the court erred in giving instructions which permitted jurors to ignore mitigating evidence.

We have rejected this argument as well. *Williamson*, 812 P.2d at 409. We do so again.

This proposition is without merit.

### E.

■ In his fifteenth proposition of error Appellant claims the instruction defining "heinous, atrocious or cruel" is unconstitutional because it does not adequately channel the jury's discretion.

We addressed this argument in *Nuckols v. State*, 805 P.2d 672, 674 (Okl.Cr.1991), *cert. denied*, 500 U.S. 960, 111 S.Ct. 2276, 114 L.Ed.2d 727 (1991). We see no need to address it again. *See also Walton v. Arizona*, 497 U.S. 639, 654–55, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511, 529 (1990); *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct.

1853, 100 L.Ed.2d 372 (1988); *United States v. Pretlow,* 779 F.Supp. 758, 773 (D.N.J. 1991); *United States v. Cooper,* 754 F.Supp. 617, 623 (N.D.Ill.1990); *Nguyen v. State,* 769 P.2d 167, 174 (Okl.Cr.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3264, 106 L.Ed.2d 609 (1989).

We find no merit to this proposition.

### F.

For his sixteenth proposition, appellant contends there was insufficient evidence to sustain the aggravating circumstance he killed Mr. Sheppard to avoid arrest or prosecution for burglary.

The existence of this aggravating circumstance is determined by looking at the killer's intent. *Romano v. State,* 847 P.2d 368, 387 (Okl.Cr.1993), *aff'd,* 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994); *Williamson v. State,* 812 P.2d 384, 407 (Okl.Cr. 1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992); *Stouffer v. State,* 738 P.2d 1349, 1361–1362 (Okl.Cr. 1987), *cert. denied,* —— U.S. ——, 112 S.Ct. 1573, 118 L.Ed.2d 217 (1992); *Moore v. State,* 736 P.2d 161, 165 (Okl.Cr.1987), *cert. denied,* 502 U.S. 913, 112 S.Ct. 313, 116 L.Ed.2d 255 (1991). In the absence of his own statements of intent, such evidence may be inferred from circumstantial evidence. *Banks v. State,* 701 P.2d 418, 426 (Okl.Cr. 1985), *cert. denied,* 502 U.S. 1036, 112 S.Ct. 883, 116 L.Ed.2d 787 (1992).

Evidence during the second stage indicated Appellant had been convicted of robbing two men whom he had allowed to live. Those men gave a description of Appellant and the vehicle that ultimately allowed Appellant to be captured and imprisoned. This was true even though the victims did not know Appellant. This would tend to show a reluctance to allow another victim to live, even though he did not know the victim. The evidence also showed Appellant pulled down the shades during the burglary of Mr. Sheppard's house and wiped down what was probably the murder weapon. Both these acts tend to show Appellant did not want to be detected or identified by anyone. In the light most favorable to the prosecution, this evidence would tend to show Appellant murdered Mr. Sheppard so he would not be detected or arrested as a result of his burglary. *See Parks v. State,* 651 P.2d 686, 695 (Okl.Cr.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003.

Appellant also contends this Court has applied the "avoiding arrest" aggravating circumstance, codified at 21 O.S. § 701.12(5),[14] in a standardless, *ad hoc* fashion, rendering it unconstitutionally vague. However, Appellant has not supported his contentions with relevant argument and citations of authority, instead making vague references to other aggravating circumstances he claims are also unconstitutionally vague. Therefore, we will not address it. *Munson v. State,* 758 P.2d 324, 335 (Okl.Cr.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809. We note in passing the Oklahoma death penalty statutes have previously been held to be constitutional. *See Jones v. State,* 660 P.2d 634, 643 (Okl.Cr.1983).

Accordingly, this proposition is without merit.

### G.

In his seventeenth proposition of error, Appellant claims the trial court erroneously allowed evidence of unadjudicated crimes and bad acts to be submitted to the jury. He points with particularity the evidence he murdered Mrs. Warner. He claims this violated his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

The evidence in question was used in support of the aggravating circumstance a probability existed Appellant would commit criminal acts of violence that would constitute a continuing threat to society. There is no requirement of a prosecution resulting in a conviction for this continuing threat aggravator to be applied. 21 O.S.1981, § 701.12(7).

---

14. That statute reads in pertinent part:
 Aggravating circumstances shall be:
 . . . .

5. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution;

Indeed, this Court has held that unadjudicated acts can be used to prove the defendant is a continuing threat to society. *Walker v. State*, 723 P.2d 273, 285 (Okl.Cr.1986), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986); *Johnson v. State*, 665 P.2d 815, 822–23 (Okl.Cr.1982). The reason for this was explained in *Johnson*, where this Court quoted from *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) to the effect that a jury can consider several things to determine whether a defendant should receive the death penalty, adding:

This Court also finds persuasive the language used by the Model Penal Code. Section 210.6 of the Model Penal Code provides in part:

In the proceeding, [sentencing] evidence may be presented as to any matter that the Court deems relevant to sentence, including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition and any of the aggravating or mitigating circumstances enumerated in ... this Section. Any such evidence, not legally privileged, which the Court deems to have probative force, may be received, ..., provided that the defendant's counsel is accorded a fair opportunity to rebut such evidence. The prosecuting attorney and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

Therefore, it is not necessary there be a final conviction for an unrelated criminal offense to be admissible at the sentencing stage. Prior criminal activity is relevant to the jury determination on the aggravating circumstance the defendant would constitute a continuing threat to society. It is "essential that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek, supra*. The evidence of the Lawrence killing was properly admitted.

*Johnson*, 665 P.2d at 822–23. Here, Appellant was given ample opportunity to rebut the unadjudicated acts against Mrs. Warner, which he did in an exemplary manner. We find the evidence tested under the fire of cross-examination to be reliable. Accordingly, Appellant's proposition is without merit.

### H.

For his eighteenth proposition, Appellant alleges the "continuing threat" aggravating circumstance is vague and overbroad. We have repeatedly rejected that argument. *See Malone v. State*, 876 P.2d 707, 7715–16 (Okl.Cr.1994) and cases cited therein; *Snow v. State*, 876 P.2d 291, 298 (Okl.Cr.1994).

This proposition is without merit.

### I.

As a follow-up proposition, Appellant contends the jury relied upon the unconstitutional aggravating circumstances of heinous, atrocious or cruel; continuing threat; and avoiding arrest or prosecution in arriving at its decision. As we have found none of the aggravators constitutionally infirm, this nineteenth proposition is without merit.

### J.

In his twentieth proposition, Appellant contends the death penalty procedure is unconstitutional, as it allows the prosecutor to have unbridled discretion in determining when to seek the death penalty.

We considered this identical argument in *Romano v. State*, 847 P.2d 368, 392–93 (Okl. Cr.1993), *aff'd*, 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), and rejected it there. We do so again.

### K.

In his twenty-first proposition of error, Appellant states the trial court allowed an improper application of the aggravating circumstance the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony, 21 O.S.1981, § 701.12(6). A brief discussion is required here.

Evidence at trial showed Appellant had been sentenced to the penitentiary for two convictions of robbery with a firearm in Oklahoma County case CRF–80–3020. He was incarcerated January 19, 1981. After being

released, he committed second degree burglary and was placed back in the penitentiary system on July 20, 1987. Appellant was admitted to the Pre–Parole Conditional Supervision (PPCS) program and the procedure was explained to him on June 27, 1989.

The evidence also established that under the PPCS program, if an inmate does not agree to abide by certain rules and conditions, he can be returned to prison. For the first month or so, Appellant did well on the program; however, he missed an office visit in August and had some curfew violations. The first part of September, Appellant's probation officer had decided to classify Appellant as a program failure and send him back to a lock-down unit; however, she was unable to do so because of a bed shortage in prisons. Mr. Sheppard was killed September 4; Mrs. Warner was killed September 16. During this time, Appellant was still in PPCS.

Appellant acknowledges he was on the PPCS program, but argues the aggravator the jury found does not apply to those in his situation.

The statute reads in pertinent part:

Aggravating circumstances shall be:

. . . .

(6) The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony;

Appellant argues the statute is only applicable to those inside the prison walls; therefore, he was not actually "serving" a term of imprisonment at a Department of Corrections institution at the time of the killing.

We have not addressed this particular aspect of this aggravator before. However, we have held those who are in the PPCS program are still incarcerated. *See Barnett v. Moon*, 852 P.2d 161, 162 (Okl.Cr.1993) (". . . *pre* parole is by definition not parole, but a preparatory status to parole itself. And since "parole" means release from jail, prison or other confinement after actually serving part of a sentence, logically *pre* parole means

*before* such release."); *Harper v. Young*, 852 P.2d 164, 165 (Okl.Cr.1993) ("As set forth in *Barnett*, the question concerning the PPCS program is not whether an inmate is in custody, because he is; but the degree of confinement used in that custody. The degree of confinement is not of concern to this Court, so long as an administrative procedure affords an appropriate method by which the decision to change the degree of confinement can be justified."). We have held in other areas an inmate need not actually be confined within prison walls to be considered imprisoned. *Hunt v. State*, 793 P.2d 1366, 1368 (Okl.Cr.1990) (defendant outside prison walls on limited pass can be convicted of "escape"); *McCoy v. State*, 536 P.2d 1309, 1312 (Okl.Cr.1975) (inmate who escapes from hospital can be convicted of escape). *See also Urbauer v. State*, 744 P.2d 1274, 1275 (Okl.Cr.1987) ("for purposes of escape from a penal institution, 'custody' may be restraint by either physical means or a superior force acting as a moral restraint.") Given these earlier cases indicating one need not be behind bars to be "imprisoned," and the fact *the conditions of PPCS were explained to him when he was released from a correctional facility*, Appellant cannot claim he did not have notice his status was the same.

Clearly, Appellant was "imprisoned" as the term is commonly defined. It seems obvious the Legislature enacted this aggravator in order to protect persons who, even though they may be incarcerated, are still members of society. It makes little sense to hold the aggravator can be used to protect one segment of society, while not protecting an even greater segment of that same society.[15]

Therefore, this proposition is without merit.

### L.

▆ For his twenty-second and last proposition of error, Appellant claims as unconstitutional the statutory requirement a jury list aggravating circumstances as specific find-

15. The Alabama Court of Criminal Appeals was faced with a similar situation in *Whisenhant v. State*, 555 So.2d 219 (Ala.Cr.App.1984), *aff'd*, 555 So.2d 235 (Ala.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990). There,

a defendant committed a murder while on parole. The court held that was sufficient to satisfy the aggravating circumstance the murder was committed while "under sentence of imprisonment." *Id.*, 555 So.2d at 229, 231.

ings of fact before the death penalty can be imposed. He claims this runs afoul of the constitutional prohibition against special verdicts found in Okla. Const. art. 7, § 15.[16]

We have previously addressed that contention in *Romano v. State*, 847 P.2d 368, 384–85 (Okl.Cr.1993), *aff'd*, 512 U.S. ——, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). We see no need to address it again.

## VII. MANDATORY SENTENCE REVIEW

■■■ This Court is required by 21 O.S. 1991, § 701.13(C) to determine whether (1) the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of aggravating circumstances as enumerated in 21 O.S. 1981, § 701.12. Pursuant to this mandate, we shall first determine whether the evidence was sufficient to support the imposition of the death penalty.

The prosecution alleged five aggravating circumstances: Appellant was previously convicted of a felony involving the use or threat of violence to the person (21 O.S.1981, § 701.12(1)); the murder was especially heinous, atrocious, or cruel (21 O.S.1981, § 701.12(4)); the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution (21 O.S.1981, § 701.12(5)); the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony (21 O.S.1981, § 701.12(6)); there existed a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society (21 O.S.1981, § 701.12(7)).

The jury found the existence of all five. We have addressed the sufficiency of the evidence supporting murder during imprisonment; and the evidence supporting the aggravator he killed Mr. Sheppard to avoid arrest or prosecution for burglary.

■■■ To show prior violent felonies, the prosecution presented witnesses who had been victims of a robbery and car theft committed by appellant in 1980. The witnesses were getting in a vehicle outside a supermarket in Oklahoma City when Appellant approached them, pointed a pistol at them and angrily threatened to blow their heads off if they did not give him their money and the car keys. Another witness testified Appellant became friendly with her to the point she began to feel uncomfortable around him and would not answer her door when he would attempt to visit her. One night when she arrived at her Bethany apartment she saw movement in her apartment before she entered. She notified police, who chased down and arrested Appellant. Appellant had rifled through her belongings; and was carrying an electrical cord he had ripped from an appliance in the apartment. The cord was approximately five and one-half to six feet long; and the clear implication was Appellant intended to use the cord in some manner against the woman who occupied the apartment. Evidence showed Appellant was convicted of two counts of robbery relating to the supermarket holdup, and one count of second degree burglary relating to entering the woman's apartment in Bethany.

This evidence is sufficient to support the aggravating circumstance Appellant was previously convicted of a felony involving the use or threat of violence to the person.

■■■ Also supported by the evidence is the aggravating circumstance there existed a probability Appellant would commit criminal acts of violence that would constitute a continuing threat to society.

Mr. Sheppard was killed on or about September 4, 1989. On September 17, the brutalized body of Monteen Warner was found inside her home at 1021 N.E. 6th, a few blocks from Mr. Sheppard's home. A television set was missing from the home. Ms. Warner was naked from the waist down, a plastic bag over her head. A nylon rope or belt was found underneath her. Also found under the body was a wooden mallet broken

---

16. That section reads:
 In all jury trials the jury shall return a general verdict, and no law in force nor any law hereafter enacted, shall require the court to direct the jury to make findings of particular questions of fact, but the court may, in its discretion, direct such special findings.

in two. A sharpening steel, bent at the handle with traces of human blood on it, was also found; the object was apparently hammered into the victim's throat. In addition, numerous bruises were found on her body. An autopsy revealed she had been choked with enough force to break a bone in the neck. Cause of death was suffocation. Evidence both at the scene and from other witnesses connected Appellant to this crime. The evidence also indicated Appellant had performed some yard work for Ms. Warner, and was unhappy about how much he was paid.

Other evidence showed Appellant seriously beat a fellow inmate in the county jail in June 1990. Witness heard Appellant tell the inmate, David Schnelle, he was going to kill him. Schnelle had to be hospitalized; he required surgery to remove a broken bone from his retina, an eye was knocked out of its socket, and a cheek bone was broken in the beating. No explanation was given for the beating; but Appellant became angry at Schnelle several days before during a card game, and had threatened to beat him.

In February 1992 during a search of Appellant's cell, authorities found a homemade ice pick consisting of three metal rods (originally reinforcement rods in the concrete around the jail windows) sharpened at one end and tied together with torn sheets.

This evidence more than supports the aggravating factor that there existed a probability Appellant would commit criminal acts of violence that would constitute a continuing threat to society.

 The remaining aggravating circumstance is the murder was especially heinous, atrocious, or cruel. The 86–year–old Mr. Sheppard was stabbed in the abdomen; there were three stab wounds on the left side of the victim's neck; there were cuts on his hand. The characteristics of the wounds indicated they may have been made by someone behind the victim, who reached around and stabbed him in the front. The cuts on the hand indicated the victim struggled to fend off the knife. The knife wound to the abdomen was two and one-eighth inches wide, and extended at least four and one-half inches into the body, damaging the large

intestine, small intestine, the liver, and the diaphragm. The medical examiner testified death was not immediate; the victim could have lived as long as 30 minutes or more. The crime scene revealed blood all over the bedroom, including large puddles on a dresser, as if the victim had doubled over the dresser at some point. He was not found in front of the dresser. Presence of the blood throughout the bedroom indicates the victim did not immediately lose consciousness after being stabbed repeatedly; rather, he moved around the room before falling between the bed and the wall.

In the light most favorable to the prosecution, this evidence supports the jury's finding the murder was especially heinous, atrocious or cruel. It showed the victim suffered serious physical abuse while still conscious.

In contrast to this evidence in support of aggravation, Appellant presented the following mitigating circumstances: he was abandoned by his father by age 3; by age 4 he was begging on the streets; his developmental history was slowed by a poor home life; an adverse psychological impact of being told his parents had been killed, when they had not been; the only father figure in his life was killed by his mother while he was still relatively young; his growth years were marred by a mother with alcohol problems who physically abused him by beating him with extension cords, sticks, bats and other items; his mother's rejection of him after he was released from a delinquent boys' home; adverse influences and condition at the boys' home; he had been institutionalized for approximately 12 years of his first 18 years of life; he was sexually abused while in prison; he was addicted to drugs at an early age, and was addicted at the time of the homicide.

Reviewing the evidence in mitigation and aggravation, we find the sentence of death to be factually substantiated and appropriate. We find no indication the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.

## VIII. CONCLUSION

Finding no error warranting reversal or modification, the judgment and sentence for Murder in the First Degree is AFFIRMED.

JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., concur.

CHAPEL, J., concurs in results.